CHARLES G. WING v. THE COMMERCIAL AND SAVINGS BANK, ANTOINE E. CARTIER, AND HAVEN S. FULLER.

*Equity jurisdiction—Banks and banking—Authority of cashier— Payment—Estoppel.*

1. Upon the facts stated in the opinion, equitable jurisdiction is held to have been properly invoked.

2. Usually, the authority of the cashier of a bank is a limited authority, and a party seeking to show a release by the cashier from liability upon commercial paper held by the bank, except in the ordinary course, must show that the cashier had authority from the directorate, or that the act had been ratified or acquiesced in by the bank. Such authority, however, may be shown expressly or by necessary implication, or it may be established by the particular usage, practice, or mode of doing business of the bank.

3. If a cashier is allowed to exercise general authority in respect to the business of the bank for a considerable time,—in other words, if he is held out to the public as having authority in the premises,—the bank is bound by his acts, as in case of an agent of any other corporation, by whatever name he may be designated, in the same manner as if authority were expressly granted.

4. Upon the facts stated in the opinion, the defendant bank is held estopped from repudiating the agreement of its cashier to release the complainant from liability on a note given by him to the bank, and said note is further held to have been paid.

Appeal from Mason. (McMahon, J.) Argued October 5, 1894. Decided January 22, 1895.

Bill to cancel a promissory note, and to restrain the further prosecution of an action at law thereon. Defendants appeal. Decree affirmed. The facts are stated in the opinion.

*C. G. Wing* (*H. H. Wheeler*, of counsel), for complainant.

*Fitch & Reardon* (*Dovel & Smith*, of counsel), for defendant bank.

*M. B. Danaher*, for defendant Cartier.

McGRATH, C. J. In the early part of April, 1892, Charles T. Sawyer and Don F. Cargill obtained from one Charles Mears, of Chicago, an option for the purchase of about 2,000 acres of land lying immediately north of the city limits of Ludington, Mich., for the sum of $15,000. They then held a conference at the office of the defendant bank with the defendant Fuller, who was the cashier of the said bank, and the complainant, Charles G. Wing, at which it was agreed that the four parties named should organize themselves into a body corporate, purchase said lands, and engage in a scheme for developing the city of Ludington, popularly known as "booming." They were to grant bonuses to manufacturing establishments to induce them to locate their plants in Ludington, expecting, as it is fair to assume, that the resulting appreciation in real estate values would eventually, if not at once, bring them a fair return, at least, for their investment and enterprise. It was agreed by Fuller that the defendant bank would furnish, upon the notes of the individual corporators, all money necessary to buy the said lands.

A corporation was accordingly formed, with the four individuals aforesaid as its stockholders. The corporation was known as the "Development Company of Ludington," and each of the four corporators held an equal share of

its capital stock. The complainant herein was chosen its president, and said Fuller its secretary and treasurer. The defendant bank, through the manipulations of Fuller, furnished the funds to purchase the lands aforesaid, taking three notes, each dated April 11, 1892, due in four months from date, and each for the sum of $5,000, making up the $15,000, the purchase price of the Mears land. One of these notes was signed by Wing, the complainant, as maker, and indorsed by the other three parties; a second was signed by Sawyer, as maker, and indorsed by the others; and the third was signed by Cargill, as maker, and indorsed by the other three corporators of the development company.

The note first above mentioned is the one more particularly in issue in this case. It reads as follows:

"$5,000. LUDINGTON, MICH., April 11, 1892.

"Four months after date, I promise to pay to the Commercial and Savings Bank, or order, five thousand dollars, at the Commercial and Savings Bank, Ludington, Mich.. for value received, with interest at 8 per cent. per annum. until paid.

"C. G. WING..

[Indorsed] "H. S. FULLER.
"D. F. CARGILL.
"CHAS. T. SAWYER."

The deed of the land from Charles Mears was taken directly to the defendant bank. Within a short time afterwards the development company purchased 80 acres. of land in the same locality, known as the "Danaher & Melendy Addition," for the sum of $2,000, and still another 40 acres, known as the "McDole 40," for $600. The defendant bank also furnished the money for these purchases upon the notes of the company, indorsed by the individuals aforesaid.

The development company proceeded, largely under the direction of Fuller, to carry on the booming business..

Great expenses were incurred. One hundred and sixty acres of the land was platted into city lots, and a great public sale of these lots was advertised in July, 1892. Excursions from Chicago and other points were advertised; a barbecue provided. At the sale about $10,000 worth of the lots were disposed of. The reckless expenditures of money by the management, however, consumed a large part, if not all, of the proceeds of the sale. Fuller had been the guiding spirit in these schemes, and his conduct of affairs gave rise to dissensions among the stockholders of the development company. Some conferences were held, and the complainant, after investigating the affairs of the company, insisted that it was in a perilous situation, and that an assignment must forthwith be made by the company for the benefit of its creditors. To this course Fuller strenuously objected, on the ground that such a course would be highly injurious to the defendant bank, as the latter held so much of the paper of the company that its standing and credit would be impaired if the facts became known and the company should assign. Fuller asked the complainant to sell his interest to him (Fuller) in the company; and this the complainant agreed to do, provided he could be released from all liability on his obligations to the bank on behalf of the company. Fuller readily promised the complainant to indemnify him against his liabilities to the bank on the development company's paper; but the complainant refused to accept Fuller's undertaking, and said he would deal only on condition that he could deal with the bank itself; that, if the bank would release him, he would step out of the development company, and Fuller might manage its destinies as he pleased. Fuller then undertook to give the release of the bank, and, in pursuance of that understanding, executed and delivered to the complainant a release in the following words:

"In consideration of the assignment of his 600 shares in the development company and a mortgage this day given by said company on its lands, the Commercial and Savings Bank of Ludington does hereby release C. G. Wing from his liability as indorser on all notes heretofore given by the development company to this bank, amounting to over $20,000, being notes given for purchase price of the Mears land, the Danaher & Melendy land, the Mendelson factory, and a few smaller notes.

[Seal of Bank.] "H. S. FULLER, Cashier."

Immediately below this, and on the same sheet of paper, was the following:

"In addition to the above release, I do personally guarantee that I will secure other indorsements for the development company paper in place of the name of C. G. Wing, when the same shall mature.

"Dated, August 1, 1892. H. S. FULLER."

The notes matured on August 15, 1892; and about that time complainant asked Fuller for the notes, and was assured by him that they were paid, and would be delivered up. He said that some of the notes had been deposited as collateral, and had not been gotten in yet, but would be in a few days, and would be canceled and delivered up. In the meantime the stock of Sawyer and Cargill had been purchased by Fuller, who was now the sole proprietor of the assets of the development company, and its sole stockholder, except the 600 shares held by the bank. Sawyer and Cargill were to be released also, and about the same time they made inquiry for the notes. Mr. Sawyer especially inquired several times, and was answered over and over again, almost impatiently, that the notes had been paid, and would be delivered up in a few days. It was not claimed that Sawyer and Cargill had bargained for their release from the bank, but Fuller had acquired their stock, and was to release them himself.

It is not claimed that any of the other directors or

officers of the defendant bank had any actual knowledge of these transactions, or took any part in them. Fuller and his relatives and personal friends, all of them non-residents of Ludington, owned a majority of the stock of defendant bank; and Fuller, as he often boasted, was the sole manager, and could do anything he pleased in rela-tion to the management of the bank. He openly asserted this on different occasions, and his course of conduct lent all possible color to the claim. He advanced the money of the bank to build a club-house in the city of Luding-ton. He took stock in manufacturing companies, and did other extraordinary things for the cashier of a bank to do, without any protest on the part of the resident directors of the bank. The directorate was made up of men totally unacquainted with banking, men engrossed in other affairs, and who had neither time nor inclination to look after the affairs of the bank. They voluntarily left all matters to the discretion of Fuller; seldom held meetings of the directors; and it is uncertain, under the evidence, whether a meeting was held between the 1st of April and the 15th of August of the year 1892. Mr. McMaster, the vice-president, says he thinks there must have been a meeting between those dates, but is not sure of it. Mr. Rath, another director, has no recollection on the subject, and says he seldom attended the meetings when they were held. It appears from all the testimony that the boast of Fuller that he controlled the bank was not an empty or idle one by any means. It does not appear that the out-side stockholders took their stock on the express condition that Fuller should have absolute control, or that there was any express agreement to that effect. It does not appear whether the directors had actually voted to confer unusual powers upon Fuller, but it does appear that he claimed and exercised them without let or hindrance on all occa--

sions. He was by sufferance, if by no other authority, something more than a cashier; he was the manager of the bank.

At the time these negotiations were going on, it was talked in Ludington that there was a necessity for the organization of a new development company to carry forward the work begun by the old company, but which it had proved inadequate to carry out. To this end a meeting was held in the office of R. P. Bishop, at which a large number of the leading citizens of the city were present, and among them the cashier, the president, the vice-president, and several of the directors of the defendant bank. At that meeting a full statement was made of the affairs of the old development company, showing the amount of its indebtedness to the defendant bank and to others. It was considered to be of prime importance that no default should be made in carrying out the promises made by the development company; and the projectors of the new company proposed to be formed felt that they must pay such a price for the assets of the old company as would discharge all its just debts. It was a matter of common notoriety in the city that the defendant bank was carrying a large amount of the development company's paper, and was in peril on account thereof. It was a part of the plan of the public-spirited citizens engaged in the movement that they should and must relieve the bank from its embarrassment. For the purpose of ascertaining the amount necessary to accomplish the purposes in view, a committee was appointed to examine into the affairs of the old company, and report. To this committee, Fuller exhibited his vouchers for expenditures of the old company, and all the matters were allowed, except what Fuller had paid for the stock of Sawyer and Cargill, and some item of expense for an excursion steamer, which the committee found was unauthorized; and they found that, if they paid

$33,000 for the assets of the old company, that amount would liquidate all the indebtedness of the old company, relieve the defendant bank of all its development company paper, and accomplish all the purposes they had in view. Fuller, the sole owner now, with the bank, of the assets of the old company, conducted the negotiations on one side, with the committee on the other; and, finally, the committee agreed to a price of the amount aforesaid to be paid by the new company for the assets of the old, not because they were worth that sum, but because the sum would set right all the blunders which had been made, and redeem all obligations in good faith.

The new company was organized on September 8, 1892, and incorporated under the name of the "Citizens' Development Company." The new company, when organized, ratified the action of the committee, and purchased the assets of the old company at the price of $33,000. All except two of the directors of the bank, residing in Ludington, became stockholders in the new company. Fuller subscribed for $7,500 in the stock, and Cartier, the president of the bank, for a like amount; others took smaller amounts. On September 20, 1892, at the request of Fuller, complainant, who still remained nominally the president of the old company, executed a deed of all the lands of the old company to the new, and delivered it to Fuller, without compensation or question, relying, as he says, and as seems altogether probable, upon the release he held from all liabilities on account of the old company. On September 24, 1892, the defendant Fuller delivered the deed just mentioned to Stray, the treasurer of the new company, and Stray paid to him $32,628.75, being the purchase price aforesaid, less 6 per cent. for 90 days on a part of the stock subscriptions, for cash. About $11,000 of this amount was deposited by Fuller in the First National Bank, to the credit of the defendant bank, and

was soon afterwards used by the latter to purchase exchange on Chicago, Detroit, and New York. An amount of $7,000, less the discount, was made up of certified checks of different subscribers, and $15,000 was made up of two checks, or due-bills, rather, of Fuller and Cartier, for $7,500 each, less the discount, for their stock in the new company. This was all received by Fuller as so much cash, and with the express understanding that it was to pay and discharge all the paper held by the defendant bank, and given by or on behalf of the old company. This was his agreement with those liable on the paper, and with the subscribers to the stock of the new company, and was the understanding under which, beyond any possible question, the money was paid to him. It was paid to him as the proper officer of the bank to receive payment of bills receivable held by it, and was received by him for this special and particular purpose.

In December, 1892, it became evident that Fuller's management of the defendant bank was too liberal for its means, and, as he was largely indebted to it, he assigned a large amount of stock and securities to the bank to secure it. On January 1, 1893, Fuller was removed from his position as cashier, and W. L. Hammond was appointed to succeed him. On January 13, 1893, Fuller paid the interest on the note in question to the new cashier, and the payment was indorsed on the note by the latter. No mention was made of the existence of this note or any claim made upon it until June 28, 1893, when Hammond, the cashier, wrote a letter to the complainant, asking him to call and pay the note. The complainant refused to do so, and on July 10, 1893, a suit was commenced by the bank against Wing on the note. On July 14, 1893, complainant served upon the attorneys for the bank in the suit at law two interrogatories, asking that they answer whether the bank had any other or further claim against

him than the note sued upon, and· what had become of the two notes given at the same date, as well as the notes given by the development company, and indorsed by him and others. The attorneys for the bank refused to answer .these interrogatories in any way, and this suit was commenced soon afterwards.

Complainant, in his bill, asks relief as follows:

1. That the defendant bank may answer the two interrogatories hereinbefore mentioned.

2. That the defendant bank may answer how much money was paid to it on September 10, 1892, by the Citizens' Development Company, and to what extent such money was used in the liquidation of the three notes given on April 11, 1892, for the purchase price of the Mears land, and in the payment of the notes subsequently given for the purchase of other lands by the development company.

3. That the defendants Fuller and Cartier may answer the same question, and also state how much they each paid on their subscriptions of $7,500 each to the capital stock of the Citizens' Development Company.

4. That the defendant bank may be decreed to be a ·trustee for the use and benefit of the complainant for all money it has received by reason of its holding of 600 shares of the capital stock of the old development company assigned to it by complainant, or by reason of the ·deed to the new company of the lands. of the old company; and that said moneys may be set off against any claim the bank may have upon any of said notes; and that said notes may be surrendered and canceled by order of ·the court; and that said bank be declared to be equitably ·estopped from asserting any claim upon any of said notes.

5. That defendants Fuller and Cartier may be declared trustees for the use and benefit of the complainant for all moneys or other valuable property received by them by reason of the deed aforesaid, and that they be decreed to pay the same into court for the use of the complainant, and for such distribution as the court may find to be equitable.

6. That the defendant bank may be temporarily and perpetually restrained from further prosecuting its suit at law.

Defendant Fuller did not answer. The bank and Cartier answer separately, and deny any knowledge of nearly all the facts charged in the bill. They say they never knew of the transactions between complainant and Fuller; deny that they ever received any money from the sale of the lands of the old development company to the new, or on account of the 600 shares assigned by complainant to the defendant bank.

In answer to the interrogatories the bank answers that it has no other or further claim against complainant except the note for $5,000, sued upon.

" That it has no knowledge of the note dated April 11, 1892, for $5,000, signed by H. S. Fuller, as maker, and indorsed by complainant, C. T. Sawyer, and D. F. Cargill, nor of the other notes mentioned in said first interrogatory, except a note for $5,000, dated May 24, 1892, made by the development company, and indorsed by said parties. Defendant has in its possession said last mentioned note, and also a note of $200, dated May 26, 1892, and one of $500, dated April 11, 1892, each made by said development company and indorsed by said parties, which said notes are stamped " paid," and defendant stands ready to deliver the same to the proper representatives of the maker thereof at any time.

"That there was no money paid to said bank on September 20, 1892, by said Citizens' Development Company, but, as hereinbefore stated, the money paid by said company, in so far as this defendant has knowledge, on the purchase of the old development company property, was paid to the then treasurer thereof, and by him used in the payment of obligations of complainant and his said associates; nor has this defendant received any money or other thing belonging to said complainant which it could or should in law or equity apply upon said complainant's said indebtedness to this defendant."

It is first insisted on behalf of defendants that complainant's remedy in the suit at law is adequate, and that this bill does not lie. Complainant was the maker of the note upon which the suit at law was brought, but he was also the indorser upon other notes of the development

company, which had been given to the bank. None of these notes had been surrendered. The bank had refused to disclose whether or not it claimed to hold complainant upon these indorsements. The note sued upon was but a part of the transaction. The $33,000 had been raised to liquidate the indebtedness of which these notes were a part. That sum had been paid over to Fuller, as cashier of the bank. Cartier, the president of the bank, and others of the directorate, had participated in the raising of the fund. If it had not been applied as contemplated, complainant was entitled to an accounting and to such application. We think, with the trial court, that the institution of this suit was a proper proceeding, and that equity has properly been invoked in the interests of complete justice and adequate redress.

This brings us to a consideration of the merits of the case. This is not a case where a cashier with limited authority has, in consideration of a transfer of stock, undertaken to release a party from liability upon paper held by the bank without the knowledge of the directorate or ratification by that body. The rule undoubtedly is that usually the authority of a cashier of a bank is a limited authority, and that a party seeking to show a release by the cashier from liability upon commercial paper held by the bank, except in the ordinary course, must show that the cashier had authority from the directorate, or that the act had been ratified or acquiesced in by the bank. That authority, however, may be shown expressly or by necessary implication, or it may be established by the particular usage, practice, or mode of doing business of the bank. If a cashier be allowed to exercise general authority in respect to the business of the bank for a considerable time,—in other words, if he is held out to the public as having authority in the premises,—the bank is bound by his acts, as in case of an agent of any other corporation,

by whatever name he may be designated, in the same manner as if authority were expressly granted. The directorate of a bank cannot be permitted to neglect its duties, abandon the management to the cashier, permit him openly and notoriously and without rebuke to deal with the public as having authority, and then escape responsibility. *Hirschmann v. Railroad Co.*, 97 Mich. 384. The official title confers the powers usually exercised in the ordinary course by such officers, and none others; but the directorate cannot be allowed to hold him out as having ample authority, and then repudiate his acts. In the present case the directors rarely met, and then only at the solicitation of Fuller, when, in his opinion, the emergency called for such meeting.

This transaction originally involved a loan of $15,000 from the bank, which sum was afterwards increased. The title to the land purchased was vested in the bank, and afterwards conveyed by the bank to the company. The directors profess to have had no knowledge of these transactions; indeed, the president of the bank testifies that he did not know, at the time of the formation of the new company, that the bank held this paper, aggregating the sum of $15,000. The president and several of the directors say that they did not learn of the transfer of the stock to the bank until the hearing in the present case, in January, 1894. Yet it is in evidence, and not disputed, that in July, 1893, the new cashier of the bank, upon request, produced from the archives of the bank the stock, with the transfer thereof. The reason given by each of the directors for the change of cashiers on January 1, 1893, is that Fuller's management of the affairs of the bank was unsatisfactory. It remained for the bank examiner to inform the directors as to the condition of the affairs of the bank, and to disclose to the directors that

103 Mich.—37.

Fuller was indebted to the bank to the extent of $30,000. This condition was apparent upon a cursory examination of the books of the bank and the notes and securities held by it. Fuller does not appear to have covered up his transactions. The directors of a bank are chargeable with such knowledge as reasonable and ordinary attention to the duties of the office would have disclosed. The note sued upon became due August 14, 1892, thirteen days after the stock had been transferred to the bank. The note remained in the bank, and, as it is claimed, unpaid, until six months after Fuller's successor had been chosen, and until June 28, 1893, before any claim was made against complainant upon it. In the meantime, with the knowledge of the officers of the bank, $33,000 had been paid over into the hands of the cashier of the bank for the express purpose of the payment of this very note, then past due, with other liabilities of the old company. The bank officials insist that this money was paid over to Fuller as treasurer of the old company, then defunct. But although one of the principal objects of the formation of the new company was the relief of the bank, although the bank was the principal creditor of the old company, although the money was turned over to its cashier for the express purpose of paying the indebtedness to the bank and other indebtedness, yet these bank officials gave no heed to its application, but allowed Fuller to appropriate the money due the bank to his own use, and, for months thereafter, this matured note remained as part of the assets and bills receivable of the bank.

The record clearly shows that Fuller was permitted by the directorate to exercise unlimited authority; that he took this transfer of stock, and gave this release, to prevent an assignment by the development company and consequent injury to the bank; that he controlled the affairs

of that company, claiming to act in the interest of the bank; that he brought about the formation of the new company, and secured the avails of the subscription to the stock of the new company, making a like claim; that he received the moneys from the new company as cashier of the bank in payment of the matured indebtedness of the bank (including the note in question), with other indebtedness. Indeed, the sum of $11,000, part of the $33,000, paid over to him, was paid by a credit to the defendant bank at another local bank, and that sum, mingled with other credits, was afterwards drawn out by the defendant bank, in the usual course of business. Fuller held himself out as acting for and in the interest of the bank. He was under no check by the directorate. The transfer made to the bank is an executed consideration, upon which complainant relied and Fuller acted. The bank actually received $11,000 in consequence of these manipulations, and the only reason why it has not received the full measure of benefit is because its directors permitted Fuller to have full sway. Not only is the bank estopped from the attempted repudiation of the agreement of its cashier, but the note in question must be held to have been paid.

The decree of the court below is affirmed, with costs to complainant.

LONG, MONTGOMERY, and HOOKER, JJ., concurred. GRANT, J., did not sit.