FARMERS' & MECHANICS' BANK *v.* CLANCY.

BANKS AND BANKING—BILLS AND NOTES—COMPROMISE—AUTHORITY OF CASHIER—PRINCIPAL AND AGENT.

In an action upon a promissory note that the defendant claimed had been compromised by an agreement of plaintiff bank, through its cashier, to accept certain bonds in part payment, where the evidence showed that no direct authority was conferred by the board of directors upon the cashier to accept anything but cash in payment of obligations, and that the discount committee met frequently; that the officers of the bank were diligent, and no special authority could be implied from the course of dealing between the bank and its cashier, the court should have determined on the trial, as a matter of law, that the cashier had no authority to make the compromise.

Error to Washtenaw; Kinne, J. Submitted October 27, 1910. (Docket No. 140.) Decided December 7, 1910.

Assumpsit by the Farmers' & Mechanics' Bank against William J. Clancy on a promissory note. Judgment for defendant. Plaintiff brings error. Reversed.

*A. J. Sawyer & Son*, for appellant.

*Arthur Brown* and *M. J. Cavanaugh* (*E. R. Sutherland*, of counsel), for appellee.

MOORE, J. This suit was commenced to recover the amount due on a note given to the Farmers' & Mechanics' Bank for $4,378.75, bearing date April 27, 1903, payable six months after date, without grace, with interest at 5½ per cent., signed by the Ann Arbor Brewing Company, by Ernest Rehberg, president, William J. Clancy, secretary, and Herman Hardinghaus, and indorsed by the same persons. The note recites that there were deposited and pledged with the Farmers' & Mechanics' Bank, as

collateral security for the payment of this note, and any other indebtedness due or to become due to the bank, certain bonds and stock.

At the time of giving the note in suit the Ann Arbor Brewing Company was further indebted to the plaintiff bank upon two notes for $1,000 each, signed by the Ann Arbor Brewing Company, indorsed by Clancy, Rehberg, and Hardinghaus, also one note for $1,000, signed by the Ann Arbor Brewing Company and indorsed by Clancy and Rehberg, also one note for $500, signed by the Ann Arbor Brewing Company, and indorsed by Rehberg and Hardinghaus. On the 4th day of December, 1903, plaintiff's bank began three suits, one against the Ann Arbor Brewing Company, William J. Clancy, and Ernest Rehberg, to recover upon the two notes of $1,000 each, indorsed by Clancy and Rehberg, one upon said $1,000 note signed by the Ann Arbor Brewing Company and indorsed by Clancy and Hardinghaus, and one against Rehberg and Hardinghaus on the $500 note signed by the Ann Arbor Brewing Company, and indorsed by Hardinghaus and Rehberg. The defendants appeared in each of said cases, pleaded the general issue, and on the 26th day of December, 1903, judgment was rendered in all three of the cases for the amount of the notes, interest, and costs respectively.

The defendant pleaded the general issue, and gave notice of a defense which is stated in the brief of counsel as follows:

"Defendant was to confess judgment on the three one thousand dollar notes for himself and secure confession on behalf of the Ann Arbor Brewing Co.; he was to pay the judgment rendered upon the note indorsed by himself and Hardinghaus; the bank was to take out execution against the Brewing Co. on the two one thousand dollar notes indorsed by defendant and Rehberg and levy upon its property, and defendant was to bid it in, was to pay all the costs of the suits and the levy, and hold the bank harmless in regard to the whole matter, including the fees of the bank's attorney, Mr. Norris; and defendant was to re-

lease the bank from all liability to him by reason of its unauthorized release of $2,000 worth of the collateral deposited with the note in suit. In consideration of these acts on the part of defendant, the bank agreed to accept the $4,000 of bonds still held as collateral to the note in suit as payment on said note, *pro tanto*, and release defendant from liability for the rest of the note."

The case was tried before a jury, which returned a verdict in favor of defendant. The case is brought here by writ of error.

It is apparently conceded that as to the question of whether a contract was made as the defendant and his attorney swear positively it was made, while the cashier of the bank and its attorney swear as positively that no such contract was made, that this would, under proper conditions, present a question of fact to be passed upon under proper instructions. But it is contended by appellant (we quote from the brief):

"The plaintiff claims, that conceding the claimed contract to be as set up in the plea and shown by the testimony:

"(1) That neither Mr. Belser, as cashier, nor Mr. Norris, attorney for the bank in the three suits mentioned, had any authority or power to make a contract of the character and kind mentioned in the testimony, and therefore the bank was not bound by any such contract, if one was made as claimed.

"(2) That if such a contract was made as claimed by the defendant, there was no consideration for the contract, and it was, therefore, void.

"(3) The rulings and decisions of the court in receiving and rejecting testimony and remarks of the court made in the presence of the jury were erroneous.

"(4) The failure and refusal of the court to rule upon objections was erroneous.

"(5) The remarks of counsel made in the presence of the jury were erroneous."

Whatever may have been the attitude of counsel in the court below, they apparently agree in this court as to the law of the case. We quote from the brief of counsel for appellant:

"A cashier of a bank has no legal authority by virtue of his position to compromise a claim of the bank, or to execute a composition agreement and release therefor. Such a power is discretionary, calling oftentimes for the exercise of considerable reflection, and a high decree of judgment. It is strictly a sacrifice, at least of nominal property of the bank, and is a function of the board of directors, and not of an executive officer. Magee on Banks & Banking, p. 178 (bottom); *Chemical Nat. Bank* v. *Kohner,* 58 How. Prac. (N. Y.) 267; *Bank of Commerce* v. *Hart,* 37 Neb. 197 (55 N. W. 631, 20 L. R. A. 780, 40 Am. St. Rep. 479); *North Star, etc., Shoe Co.* v. *Stebbins,* 2 S. D. 74 (48 N. W. 833, 834); 2 Comp. Laws, § 6093, subd. 7. The extent of the general powers of a cashier of a bank is a question of law, and not of fact. *Farmers' & Mechanics' Bank* v. *Troy City Bank,* 1 Doug. (Mich.) 457; *Peninsular Bank* v. *Hanmer,* 14 Mich. 208. And a charge is erroneous which refers it to the jury to determine whether a cashier as such has power to accept stock and bonds in payment of notes of the bank. 1 Doug. (Mich.) *supra.*"

Counsel then proceed to quote at length from the cases cited.

In relation to the proposition of counsel for plaintiff the counsel for defendant reply as follows:

"Appellant argues that Mr. Belser, as cashier, had no authority to make a contract of the character mentioned in the testimony. At the head of its discussion of this point it places the caption, 'Cashier's Powers,' and quotes from Magee on Banks and Banking in respect to the authority which the cashier of a bank possesses by virtue of his office. Now, we do not claim that a cashier as such, and solely by virtue of his office, would have authority to make that agreement which the jury have found was made in this case. The case was not tried on that theory, nor was the jury instructed upon that theory. Appellant says that the power to release an indorser or compromise a claim is not within the power which a cashier possesses by virtue of his position; that the extent of the general powers of a cashier of a bank is a question of law, and not of fact; and that a charge is erroneous which refers it to a jury to determine whether a cashier as such has power to accept stock and bonds in payment of the notes of the

bank. We admit all this. * * * If the testimony had merely shown that Mr. Belser was cashier of plaintiff bank, and it had been contended that upon such a showing as the jury should say whether or not the bank was bound by the compromise agreement, appellant's argument would have been sound, and its authorities would doubtless have sufficed to demonstrate that the bank was not bound. But the defendant did not show merely that Mr. Belser was cashier. He did not claim that a cashier as such was authorized to compromise a debt. What he did show was that Mr. Belser was intrusted with the entire management of the bank. He might have been the bank's president, or vice president, or assistant cashier, or merely a director. The position he occupied is unimportant, for no argument as to his authority is drawn from his position. Defendant did not claim that because Mr. Belser was cashier he could bind the bank. He claimed that Mr. Belser could bind the bank because he was intrusted by the board of directors with the bank's management and had been so intrusted for twenty years. In other words, the case was tried upon a wholly different theory from that which appellant now seeks to inject into it. It was tried upon the theory that the cashier, by the long continued and well understood practice of the board of directors, was authorized by the board to do all acts which could be done by the board itself and which it could lawfully authorize a cashier to do. The principle according to which this case was tried was that stated by this court in *Davenport* v. *Stone*, 104 Mich. 521 (62 N. W. 722, 53 Am. St. Rep. 467), where the court says:

" 'The directors intrusted the entire management of the bank to the cashier, Mr. Bradley. Therefore, neither the bank nor its receiver can now be heard to deny the authority of the cashier to do any of those acts which it or its directors might lawfully authorize the cashier to do.'

" The rule is stated by Mr. Morse as follows:

" ' If the directors have for many years allowed the cashier to do, without interference, all the business of the bank, they are held thereby to have conferred upon him authority to do anything and everything on the corporate behalf which the charter or law does not absolutely prohibit and forbid a cashier to do, and so render illegal under all circumstances.' 1 Morse on Banks and Banking, § 165.

" * * * In the case of *Wing* v. *Bank*, 103 Mich. 576

(61 N. W. 1009), this court announced the same rule, and that case was before the trial judge when he charged the jury.    In fact he quoted from the opinion of this court in that case in the course of his charge, and this action of the trial judge is assailed by appellant as erroneous.    The language of the decision is given at length in appellant's brief and need not be repeated here."

As tending to support this contention counsel cite a portion of the cashier's testimony as follows:

"*Q*. And as a matter of fact the board of directors of your bank never went back on a single thing that you did, they ratified everything that you did as cashier of that bank when you were left there as managing officer in the absence of the others, you cannot now name one thing they refused to ratify, can you?

"*A*. I don't know as I can.

"*Q*. And as a matter of fact they did not.    Fred H. Belser as cashier and managing officer of that bank transacted without the aid of any one else at least 50 per cent. of the bank's business?

"*A*. I don't know as to that, probably I did most of it.

"*Q*. And as a matter of fact they ratified everything you did, and that was the understanding, was it?

"*A*. Not necessarily, no.

"*Q*. But you did it?

"*A*. Once in a while I did something they did not agree with although they ratified it and cleaned those things up.

"*Q*. And in the absence of the discount committee of that bank or board of directors you did the business for that bank and everything you did for 20 years was ratified, is not that so?

"*A*. I think so."

Counsel then proceed to argue:

"Mr. Belser, throughout his entire testimony, made every effort to show that he had no authority to make the agreement alleged by Mr. Clancy.    He was called by plaintiff for the purpose of proving want of authority in himself to bind the bank, and he declared repeatedly that he had no authority to make any such agreement.    The plaintiff's whole case rested upon its ability to show that Mr. Belser had no authority to make the contract.    And yet in the face of all this—against his own interest as a stockholder and against the interest of his bank—he ad-

mitted on cross-examination that for 20 years he was managing officer of the bank, and did most of the bank's business, that during those 20 years there was not one instance which he could recall where the board of directors had failed to ratify his acts, and that although they once in awhile disagreed with him they nevertheless ratified everything he did during those 20 years. It would be difficult to conceive of stronger testimony than this from a hostile and reluctant witness."

The trouble with this argument is that it is based upon a few statements of the witness which do not correctly represent what he testified to. Prior to giving the testimony quoted, the cashier not only denied the making of the contract, but testified as follows:

"*Q.* Did you yourself have authority to make any such contract as cashier ?

"*Mr. Brown:* We object, it is incompetent.

" *Mr. Sawyer:* A question of agency has arisen; we claim he did not have any authority to make such a contract without the action of the board of directors, and if he did it it was beyond the scope of his authority.

"*The Court:* You may ask whether he had any special authority in this matter.

"*Q.* Did you have any special authority from the bank to make such an arrangement as it is claimed you did make ?

"*A.* No, sir.

"*Q.* Did the board of directors ever give you any authority to make such a contract as they claim you did make here ?

"*A.* No, sir."

Again he testified :

"*Q.* I ask once more so there may be no mistake about it at all, Was it within the powers conferred upon you by your authority to receive in payment of any note due to the bank anything except money ?

"*A.* I had no authority to receive anything else only money for settlements.

"*Q.* Was there ever any such practice as that in your bank ?

"*A.* No.

"*Q.* When any settlement or adjustment of any claim

was made or an offer brought there for settlement, what were you compelled to do about it?

"*A.* I submitted it to the board and they acted upon it.

"*Q.* Did you ever do it any other way?

"*A.* No.

"*Q.* In that connection I ask you whether or not you ever submitted to this board or to the officers of that bank any proposition made by Mr. Clancy with reference to the accepting of those bonds in payment of his note?

"*A.* Never."

He further testified:

"The discount committee changed from time to time. There are usually three on that committee. And they meet every day, as they happen to come in, usually in the morning.

"*Q.* Then if you have a meeting of the discount committee in the morning, business that comes in in the afternoon, who looks after that?

"*A.* Well, I look after it unless it goes over to the next day.

"*Q.* Then all the business that comes in in the afternoon after the discount committee has met is acted upon by the cashier, is it not?

"*A.* Yes, sometimes. And that was true all the while I was cashier. So far as I know that is the general practice of banks.

"*Q.* The cashier is the managing officer of the bank all the rest of the time, except when the board of directors or this committee are actually in session, the cashier has charge of the bank. Is that true?

"*A.* Yes. And that was true all the time that I was there.

"*Q.* And that was true during all the time that these negotiations were going on, is that so?

"*A.* Yes.

"*Q.* So that if Mr. Clancy came to you in the afternoon, after the discount committee met in the morning, for a loan of say $5,000, that would have been considered a large loan, and in the morning you would have felt it incumbent upon you to submit it to the discount committee?

"*A.* I often telephoned to the members.

"*Q.* If it came in after the meeting of the discount com-

mittee, and it was no trouble to the customer to wait until the board passed upon it for a loan of that size?

"*A.* Yes.

"*Q.* If it came in the afternoon you would act upon it yourself?

"*A.* Unless I could telephone to the separate members.

"*Q.* Do you mean to say you ever telephoned to the discount committee or talked with them about any loan you made to Mr. Clancy?

"*A.* Yes, sir."

He further testified:

"*Q.* What part—what fractional part—would you say of the discounts that are made, that were made from day to day during all the time that you were cashier of that bank actually passed to the discount committee of the directors before the customer had the accommodation asked for?

"*A.* Well, the majority of them.

"*Q.* A majority of them, what do you mean by that, 60 per cent?

"*A* No, there is—

"*Q.* Do you mean to say that fully 60 per cent. of your discounts were passed upon? I mean the items, not the total amount of money, but 60 per cent. of the items that make up the day's business, do you mean to say that a majority of 60 per cent. of that has been passed upon by your discount committee before the customer receives the accommodation?

"*A.* Let me explain. The bank has a line of customers —a regular line of customers. Their line of credit is fixed. I was authorized to loan every man a certain amount of money, not to exceed a certain amount of money that the board passed upon. For instance, if Mr. Brown came in there, his line of credit was fixed. We could loan him as high as $3,000. He would get up to that. I had no more right to loan. I had to stop and get the consent of the board or discount committee. Fully 50, 60, 70 per cent. of the paper that came in daily was that kind of paper, that was fixed.

"*Q.* You never spoke about it to the directors at all?

"*A.* They simply approved it when they came in. I put it on the book before they met, and I transacted the business before or after their meeting, and that made no difference. That was customary all the while I was

there.    Whenever a customer came into the bank, after the discount committee had met for that day, and wanted accommodation I passed upon it, and waited until the next day for the board to O. K. it.    And I presume that has been the custom of the bank all the time."

He further testified:

"We had in our bank what is known as a discount committee.

"*Q.* And that discount committee meets how often?

"*A.* The rules of the discount committee were as follows:    Every Monday morning the discount committee is to meet with the full committee, and all of the papers that were coming due in the week following were examined and the discounts were passed' upon if they were asking for renewals, if they were not asking for that and wanted to pay them they were so marked on the memorandum and I would notify them we wanted the note paid, otherwise, the note would be renewed, and anything I had of importance in the shape of a new note I submitted to them, and we discussed the line of credits; if anybody came in we fixed the line of credits for him.

"*Q.* What do you mean by 'line of credits?'

"*A.* Suppose a new man would come in and open an account, suppose that man wants to borrow some money, we would say we will let him have not to exceed a certain amount of money.

"*Q.* Inside that line of credit what authority had you?

"*A.* I had authority to make that credit to that man.

"*Q.* If you exceeded that amount?

"*A.* Then I went to the discount committee for instructions.

"*Q.* But if it was inside that line of credit you did not have to consult with the discount committee at all?

"*A.* No.    Suppose a man was doing business with us, a man we knew, they would say, 'If that man wants $200 or $300 let him have it.'    I never submitted that to the discount committee before, I did afterwards.

"*Q.* When it was within that line of credit you discounted it to him up to the limit of that line without consulting the discount committee at all, you had that power?

"*A.* That was the arrangement we ran on.

"*Q.* I say that was the authority they gave you, if one made an application for a loan exceeding the limit, then what?

"*A.* Then I went to the discount committee and they passed upon it before it was made."

After all this testimony, came the testimony on cross-examination which counsel for defendant have quoted as showing that the cashier was the manager of the bank. Immediately following this cross-examination the cashier testified as follows:   Redirect examination:

"*Q.* Do you mean you had the right to exceed the limit fixed by the bank?

"*Mr. Brown:* I object; that is leading and suggestive.

"*Q.* Do you mean to say by your answer to Mr. Brown, that in the absence of any authority on the part of the bank for doing it, you had a right to make a settlement with Mr. Hardinghaus and take those bonds in payment of that debt without any action on the part of the bank officials on that subject?

"*Mr. Brown:* The same objection, it is leading and suggestive, and is cross-examination.   (Which objection was then and there sustained by the court.)

"*The Court:* I think it is.

"*Q.* Now, Mr. Belser, I want to know whether or not your authority to make a settlement like that of the acceptance of the bonds on the behalf of Mr. Hardinghaus was ever granted to you by the bank.

"*A.* I had this whole matter talked over before the board, the settlement of Hardinghaus and everything was understood before it was ever made.   I had no authority to settle without the consent of the board, but they acted upon those things.

"*Q.* That is what I expected you to say and wondered why you did not say it before.

"*A.* I made a general statement that I never made any settlement or did any business; of course I did those things.

"*Q.* You did those things within what limit?

"*A.* But a settlement of this kind I would always consult them about and the discount committee specially."

All this testimony was uncontradicted unless it may be said that such is the result of the cross-examination.

At this point it may be well to refer to the cases, relied upon by the defendant, of *Wing* v. *Savings Bank,* 103 Mich. 565 (61 N. W. 1009), and *Davenport* v. *Stone,* 104

Mich. 521 ( 62 N. W. 722, 53 Am. St. Rep. 467). In the first of these cases Justice McGrath, speaking for the court, said:

"It is not claimed that any of the other directors or officers of the defendant bank had any actual knowledge of these transactions or took any part in them. Fuller and his relatives and personal friends, all of them nonresidents of Ludington, owned a majority of the stock of defendant bank; and Fuller, as he often boasted, was the sole manager, and could do anything he pleased in relation to the management of the bank. He openly asserted this on different occasions, and his course of conduct lent all possible color to the claim. He advanced the money of the bank to build a clubhouse in the city of Ludington. He took stock in manufacturing companies, and did other extraordinary things for the cashier of a bank to do, without any protest on the part of the resident directors of the bank. The directorate was made up of men totally unacquainted with banking, men engrossed in other affairs, and who had neither time nor inclination to look after the affairs of the bank. They voluntarily left all matters to the discretion of Fuller; seldom held meetings of the directors. * * * It does not appear whether the directors had actually voted to confer unusual powers upon Fuller, but it does appear that he claimed and exercised them without let or hindrance on all occasions. He was by sufferance, if by no other authority, something more than a cashier; he was the manager of the bank."

In *Davenport* v. *Stone, supra,* Justice Grant, speaking for the court, said:

"Mr. Bradley, the cashier, testified that for five years prior to the suspension of the bank he was its financial manager, and that the financial management of the bank was practically left to him by the board of directors. * * * The directors intrusted the entire management of the bank to the cashier, Mr. Bradley. Therefore, neither the bank nor its receiver can now be heard to deny the authority of the cashier to do any of those acts which it or its directors might lawfully authorize the cashier to do."

It is apparent from these quotations that the two cases are as unlike the case at bar as it is possible for cases to be. In the case before us the officers of the bank were

diligent. The bank had a discount committee which met almost daily and was at all times accessible to the cashier. A careful reading of every word of the somewhat voluminous record in this case fails to show that unusual powers were conferred upon the cashier. There is no competent testimony in the case from which it can fairly be inferred that authority, either direct or implied, or by the course of business, was conferred upon the cashier to make the contract which it is claimed he made, and which he says he never made. The court instead of submitting the case to the jury should have given plaintiff's first request to charge, directing a verdict for plaintiff. It is not necessary to discuss the other assignments of error.

Judgment is reversed, and new trial granted.

BIRD, C. J., and OSTRANDER, HOOKER, and STONE, JJ., concurred.