FIRST NAT. BANK OF HIGH BRIDGE, N. J., v. HUDSON et al. (No. 6710.)

(Supreme Court, Appellate Division, First Department. February 5, 1915.)

1. BANKS AND BANKING (§ 112*)—EMBEZZLEMENT BY CASHIER—FOLLOWING FUND.

A cashier of a bank made a practice, with the knowledge and approval of the board of directors, of paying for investments purchased for the bank with checks on his personal deposit and crediting his deposit with the purchase price. He followed this practice in purchasing bonds for the bank through stockbrokers, the purchase of which was authorized and ratified by the board. The bonds were left in the possession of the brokers and were subsequently sold by them and credited to the cashier's personal account with them. *Held* that, while the cashier may have been guilty of larceny in using the bonds, the funds used in paying the checks given for the purchase price, transferred to his deposit in the manner mentioned, were not stolen and could not be recovered by the bank.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. § 112.*]

2. BANKS AND BANKING (§ 112*)—EMBEZZLEMENT BY CASHIER—FOLLOWING FUND.

Where the cashier of a bank in taking certain credits in his deposit account made a corresponding charge against the cash of the bank in the cashbook and placed a check or an I. O. U. in the cash drawer, which he instructed the teller to treat as cash, the entries being made in the regular course of business and the facts discoverable by inspection of the books, such credits amounted to loans by the bank to the cashier as against persons receiving payment from the cashier's deposit.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. § 112.*]

3. BANKS AND BANKING (§ 112*)—EMBEZZLEMENT BY CASHIER—FOLLOWING FUND.

To enable a bank to recover moneys paid on checks drawn against the personal deposit of its cashier on the ground that the amount of such deposit was stolen from the bank, actual notice on the part of persons receiving such moneys that they were not the property of the cashier was essential, since, if they were merely put upon inquiry as to the validity of the checks, the presentation thereof constituted a sufficient inquiry, and their payment by the bank a conclusive answer as to their validity.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. § 112.*]

4. BANKS AND BANKING (§ 112*)—EMBEZZLEMENT BY CASHIER—FOLLOWING FUND—SUFFICIENCY OF EVIDENCE.

In an action by a bank against stockbrokers to recover amounts paid on personal checks of the cashier, evidence *held* insufficient to show actual notice to the stockbrokers that the money so paid was the property of the bank and not of the cashier.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 271, 272; Dec. Dig. § 112.*]

Appeal from Trial Term, New York County.

Action by the First National Bank of High Bridge, New Jersey, against Charles I. Hudson and others. From a judgment for plaintiff entered upon a verdict and from an order denying a new trial, defendants appeal. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, SCOTT, and HOTCHKISS, JJ.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

John A. Garver, of New York City, for appellants.
David Leventritt, of New York City, for respondent.

McLAUGHLIN, J.  The plaintiff, during the times hereinafter mentioned, was a national bank located at High Bridge, N. J., and one Beavers was its cashier.  The defendants were stockbrokers doing business in the city of New York.  On the 22d of January, 1913, Beav-.ers confessed to the directors of the bank that he had embezzled a large amount of its funds and certain stock which he had delivered to the defendants in connection with stock speculations carried on by him through them.  This action was thereafter brought to recover the proceeds of the stock—the same having been sold—and the funds alleged to have been embezzled, on the ground that defendants, when the same were received, had actual notice that they belonged to the plaintiff.

The bank was organized in 1900, and Beavers acted as its cashier from then until he made his confession, during all of which time he had a deposit account in the bank.  He also had an account during the same time, and for two years prior thereto, with the defendants.  The proceeds of the stock and the funds alleged to have been embezzled, which it was sought to recover in this action, were delivered or paid to the defendants between October 11, 1912, and January 6, 1913.  Intermediate the dates just named, Beavers delivered to the defendants 18 checks, payable to their order, aggregating $84,364.90, drawn against his deposit account with the plaintiff.  These checks went through the usual channels of collection and were paid in due course; the balance in Beavers' account with the plaintiff being sufficient at all times to meet them without overdraft.  The stocks referred to were 100 shares of Pressed Steel Car and 10 shares of New York Central.  The plaintiff's claim, when the case was submitted to the jury, was that it was entitled to recover from the defendants the aggregate amount of the eighteen checks, $84,364.90; interest thereon, $7,918.24; proceeds derived from sale of the stocks, $3,629.05; total, $95,912.19; less a balance to the credit of Beavers' account with the defendants, paid with his consent to the plaintiff, $2,383.35; leaving a balance of, $93,528.84.  The jury rendered a verdict for the full amount claimed, and from the judgment entered thereon, and an order denying a motion for a new trial, defendants appeal.

The action was tried and the appeal argued upon the theory that the credits in Beavers' account with the plaintiff were obtained by trick and device amounting in law to larceny; that the moneys paid to the defendants on the checks referred to were the moneys of the bank; that the certificates of stock which Beavers delivered to the defendants were held by the bank as collateral security for the payment of loans; and that the defendants had actual notice of these facts when the same were received by them.

After a careful consideration of this record, I am unable to find evidence sufficient to sustain the findings.: (a) That the proceeds with which the checks were paid were stolen by Beavers from the bank; (b) that the stock delivered to defendants had been put up with the bank as collateral security for the payment of loans; or (c) that the

defendants had actual notice that the stock or funds belonged to the plaintiff, or that it had any interest in them. If this be a correct view of the evidence, then defendants' motion to dismiss the complaint at the close of plaintiff's case, and renewed at the close of the whole case, should have been granted.

[1] First, as to the larceny: Beavers, as already indicated, from the organization of the plaintiff had a deposit account with it. This account was quite large and active, and especially so for several years immediately preceding the acts of which complaint is here made. During this time large deposits were made, against which many checks were drawn and paid. He would purchase investments for the bank, pay for them with his own check, and credit his account with the purchase price. This fact was known to and approved by the board of directors. The credits in the account which the respondent claims amounted to larceny were: (1) Several items aggregating $57,240.04, the purchase price of sixty $1,000 bonds bought for the plaintiff by Beavers through defendants. Beavers was authorized by the board of directors to purchase these bonds and the purchase, in each instance, was duly ratified by it. The method pursued was this: After the board had authorized Beavers to make the purchase, he would give an order to the defendants, and, on being notified that the purchase had been made, would credit his deposit account with the purchase price and send defendants a check for that amount. At the same time a proper entry was made in one of the books of the bank, showing that the bonds had been purchased and paid for. The bonds, however, were left with and subsequently sold by defendants and credited to Beavers' account. It may well be that Beavers was guilty of larceny in using the plaintiff's bonds, but that is not the claim here made. The claim is that the funds used in paying the checks given for the purchase price were stolen; in other words, that he had no right to credit his account with that amount so as to make the checks good when they were presented for payment. I am unable to see any legal basis upon which such claim can properly be predicated. The bank having authorized Beavers to purchase the bonds, he, having made the purchase and paid for them with his personal check, had a perfect right to credit his account with what he had paid; especially so, after the purchase had been ratified and approved. There was nothing unusual about it so far as the plaintiff was concerned. The same method had many times before been resorted to in making investments. The mistake which the board of directors made was that they did not require Beavers to produce the bonds when the purchase was ratified. The bank was not injured by the credit in Beavers' account or the payment of the checks, but solely by his subsequent conversion of the bonds.

[2] (2) The account was also credited with items aggregating $23,000. Beavers testified that in taking these credits in his deposit account a corresponding charge was made against the cash of the bank in the cashbook and the amount was also evidenced by a check or an I. O. U., which he placed in the cash drawer and instructed the teller to treat as cash. The entries were made in the regular course of busi-

ness of the bank, and the true facts would have been disclosed at all times by an inspection of its books. These items, it seems to me, therefore, must, so far as the defendants are concerned, be treated as loans made by plaintiff to Beavers.

(3) It is also claimed the account was improperly credited with the proceeds of certain notes of Beavers' discounted by the bank. The first note was for $7,000 and was discounted on January 4, 1913. At that time but one of the 18 checks which Beavers delivered to the defendants remained unpaid. This was a check for $2,000 which was paid by the bank on January 9, 1913. The discount of this note was approved by the bank, though Beavers concealed from the directors that it was his note which had been discounted. Proper entries, however, were made in the bank's books showing the true situation.

(4) The stocks to which reference has been made were originally purchased by Beavers through the defendants and later returned to them as security for his personal account. They sold the stocks on March 18, 1913; the Pressed Steel Car bringing $2,573, and the New York Central, $1,056.05. As to the latter, it is sufficient to say that the plaintiff failed to prove that this stock was ever held by the bank, either as collateral security or otherwise. As to the former, Beavers testified it was purchased and held by the bank as collateral for the payment of the note of one Rufe, and was kept in the pouch where the other collaterals of the bank were deposited. The proof shows, however, that this stock was purchased by Beavers in his own name. It was delivered to him by defendants and subsequently returned to them.

An examination of Beavers' account with the bank shows that immediately prior to his taking the first credit complained of he had a balance standing to his credit of $2,348.21. Subsequently, and during the period of his alleged embezzlements, there were credited to his account, items aggregating $27,920.16, the legitimacy of which does not appear to be questioned. There were also, during the same period, checks aggregating upwards of $38,000, drawn by Beavers and paid by the plaintiff to persons other than the defendants, and the legitimacy of such payments does not seem to be questioned. There is nothing in the record to indicate that at least some of the checks given to the defendants were not paid by the unquestioned credits or that the checks given to others, of which no complaint is made, were not paid by the alleged improper credits.

[3, 4] Second, as to actual notice: Assuming that the checks delivered to the defendants were paid with moneys embezzled by Beavers, the plaintiff could not recover without proving the defendants had actual notice of that fact. That actual, as distinguished from constructive, notice, was essential to defendants' liability, was frankly conceded by the learned counsel for the respondent. Indeed, it could not well be disputed, for, if the facts were only such as would put the defendants on inquiry as to the validity of the checks, their presentation constituted a sufficient inquiry, and their payment by the bank a conclusive answer as to their validity. Havana Central R. R. Co. v. Knickerbocker Trust Co., 198 N. Y. 422, 92 N. E. 12; Niagara Woolen Co. v. Pacific Bank, 141 App. Div. 265, 126 N. Y. Supp. 890.

The facts relied upon, as establishing actual notice, were that Beavers, some 14 years before his defalcations in the bank were discovered, and 2 years before the plaintiff was organized, opened an account with the defendants; that he was then a train dispatcher; that when plaintiff was organized, in a small town, with a small capital, he became its cashier, a position which he continuously held until he made his confession; that his account with the defendants, when first opened, was comparatively small; that he was then accustomed to make payments to defendants with bank drafts, but in March, 1904, at their request, he ceased doing so and remitted with his personal checks; that in March, 1905, he opened a special account with them on behalf and in the name of the bank, which was closed a year and a half later; that in the meantime he continued his personal account, and by 1908 it showed transactions involving large amounts, which were subsequently increased; that on several occasions in 1911 and 1912 he took out blocks of stock amounting to $10,000, and after keeping them for a short time returned them to the defendants; that when plaintiff was about to be examined by a national bank examiner in October, 1912, Beavers directed defendants to deliver certain bonds to the Coal & Iron Bank in the city of New York not later than 10 o'clock the following morning. But there is nothing to show that defendants had any knowledge that an examination of the plaintiff was in progress at the time the request was made, and that it made very little impression upon them is evidenced by the fact that the bonds were not delivered until after 2 o'clock instead of before 10. Stress is also laid upon the fact that Beavers had requested defendants, when communicating with him, to telegraph and use a code. The code was one of the regular ones furnished by defendants to their customers, and its use, obviously, was to secure privacy of communication. It is also urged that the amount of Beavers' transactions between October 10, 1912, and January 3, 1913, and for which the 18 checks in question were given, was sufficient to constitute actual notice. But the total of these transactions amounted to less than Beavers' total purchases during the corresponding months in all except one of the four years immediately preceding. Beavers had been a customer of the defendants for many years. His purchases and sales through them had been large. During 1911 and the first seven months of 1912, defendants had paid and delivered to him cash and securities aggregating upwards of $80,000. They knew he stood high in the community in which he lived and was connected as treasurer, director, or trustee with several important institutions, and regarded as a person of considerable means.

These facts, viewed in the most favorable light to the plaintiff, are utterly insufficient to establish actual notice. They were so remote, disconnected, and trivial that they would not, to the ordinary business man, have created even a suspicion, to say nothing of actual notice, that there was anything irregular in the transactions.

The conclusion reached renders it unnecessary to pass upon the other questions raised by the appellants.

The judgment appealed from, therefore, is reversed, with costs, and the complaint dismissed, with costs. All concur.