RUDEN, Superintendent of Banks, Appellant, v. CITIZENS NATIONAL BANK AND TRUST COMPANY, Respondent.

(266 N. W. 682.)

(File No. 7731.   Opinion filed April 16, 1936.)

*Dunham & Dunham,* and *Sterling H. Clark,* all of Clark, and *S. W. Clark,* of Redfield, for Appellant.

*Hanten, Hanten & Henrikson, Perry F. Loucks,* and *Alan L. Austin,* all of Watertown, for Respondent.

RUDOLPH, J.   On July 3, 1926, the Ware & Griffin Bank of Clark, S. D., suspended because of insolvency.   Thereafter, proceedings were had to reorganize this bank, and as a part of the reorganization it was required that new capital and surplus in the amount of $27,500 be furnished before the bank could reopen.   The officers of the Ware & Griffin Bank at the time of its closing were Margaret Elton, president; C. S. Evans, vice president; George C. Griffin, cashier; V. D. Bassart, assistant cashier.   The record very clearly establishes however, that George C. Griffin, the cashier, was in absolute control of the affairs of the bank, and that the other officers were mere figureheads and bookkeepers.   The bank was truly a "one man bank," as it is described at various places in the record.   Mr. Griffin became active in meeting the requirement of raising the new capital and surplus.   He first attempted to get the entire $27,500 from the defendant, Citizens National Bank & Trust Company of Watertown.   This defendant bank had for years been a correspondent bank of the Clark bank.   The defendant bank, however, refused to loan the entire amount of $27,500, and Mr. Griffin thereupon got in contact with the First National Bank of Minneapolis.   His negotiations with these banks finally resulted in the First National Bank of Minneapolis loaning Mr. Griffin $11,-000; the note evidencing such loan being signed by Griffin, Evans, and Bassart.   The defendant bank advanced the remaining $16,-500; $7,200 of which was loaned to stockholders of the bank other than Griffin, and is not involved in this appeal; $9,300 of this amount was loaned to Griffin for which Griffin gave his personal note.   Griffin furnished certain securities to secure the Minneapolis loan, and also furnished securities to secure the loan of the defendant bank.   The plaintiff contends that these securities were colorable only and not in any sense adequate to secure the amount of the loans.   On August 16, 1926, these loans had been completed and the defendant bank certified to the department of banking and finance of the state of South Dakota that there had been on that day deposited in defendant bank the sum of $27,500 for the purpose of supplying capital and surplus for the reorganization of the Ware & Griffin Bank.   This certificate was presented to the circuit court of Clark county, and the court thereupon entered its order directing the opening of the Ware & Griffin Bank as a solvent institution.   The bank reopened with the same officers that it had

prior to the closing. On the day that the bank was opened, Mr. Griffin, the cashier, by letter directed, the Watertown bank to pay to the Minneapolis bank, out of the $27,500 then on deposit in the Watertown bank, the $11,000 note held by the Minneapolis bank. The Watertown bank complied with these instructions, and thereupon the Watertown bank took over and held the securities which Griffin had put up to secure the Minneapolis loan. On October 4, 1926, Griffin issued a cashier's check of the Ware & Griffin Bank payable to the defendant bank in the amount of $1,403.90, to apply on the Griffin note held by the defendant bank. Thereafter, from time to time, cashier's checks and drafts signed by Griffin, as cashier of the Ware & Griffin Bank, were transmitted to the defendant bank for the purpose of paying Griffin's note in that bank. These cashier's checks and drafts amounted in all to $5,383.16, and in each instance were applied by the defendant bank upon the Griffin note. Griffin never paid anything to the Ware & Griffin Bank for these cashier's checks or drafts. On April 3, 1930, Mr. Griffin died, the bank again closed, and was taken over by the superintendent of banks for liquidation.

■ ██ The plaintiff brought this action to recover the payment of $11,000 made by the defendant bank to the Minneapolis bank upon the direction of Griffin, and to recover the payments applied upon the Griffin note in the Watertown bank, which payments were evidenced by cashier's checks and drafts, as set out above. Plaintiff predicates its right to recover upon two theories: First, plaintiff has alleged a conspiracy entered into between Griffin, the defendant bank, and the Minneapolis bank, whereby these parties conspired and agreed that for the purpose of deceiving the superintendent of banks of the state of South Dakota, they would make it appear that new capital for the Ware & Griffin Bank to the extent of $27,500 had been deposited in the defendant bank; that it was understood and agreed by all of the parties, that immediately upon the Clark bank being reopened the Minneapolis loan of $11,-000 which was a personal loan of Griffin, or of Griffin, Evans, and Bassart, would be paid out of the $27,500 of apparent bank funds then on deposit in the Watertown bank. It was further alleged that the parties had agreed that the Griffin note in the Watertown bank was to be paid with Ware & Griffin Bank funds in the man-

ner in which it was paid. The trial court in lengthy findings of fact found against plaintiff's alleged conspiracy. We have carefully reviewed the evidence, and are convinced that there findings should not be disturbed. To relate or attempt to review the evidence upon this question would serve no useful purpose. Sufficient to say is, that there was no direct evidence of any conspiracy. The only evidence regarding a conspiracy was certain statements contained in correspondence between the parties and other established facts from which it might have been inferred that a conspiracy did in fact exist. The trial court heard the evidence and saw the witnesses, and declined to draw the inferences which appellant insists should have been drawn from this testimony. We are convinced that the statements in the letters and facts adduced were subject to the construction thereon placed by the trial court. It follows that the findings of the trial court are decisive of this question.

The second theory upon which plaintiff seeks a recovery is that the defendant bank took funds of the Ware & Griffin Bank in payment of Griffin's personal obligation, knowing the funds to be the property of the Ware & Griffin Bank. It is urged, first, that when defendant bank upon the instruction of Griffin debited the account of Ware & Griffin Bank for the purpose of paying the $11,000 note which Griffin had given to the Minneapolis bank, the defendant did, in effect, knowingly take the funds of the Ware & Griffin Bank to pay this personal obligation of Griffin, that the defendant bank was benefited thereby, because it succeeded to the collateral that Griffin had put up to secure the Minneapolis bank. Second, it is urged that, when the defendant bank accepted cashier's checks and drafts of the Ware & Griffin Bank, which were signed by Griffin, himself, for the purpose of paying Griffin's indebtedness, this constituted notice to the defendant bank that Ware & Griffin Bank funds were being used for the purpose of paying this private obligation of its cashier.

We wish to state, first, that we have carefully gone over this record and find nothing therein which establishes that the defendant bank had any notice of the fact that Ware & Griffin Bank funds were being used to pay these personal obligations of Griffin other than the form in which the payments were made. The ques-

tion involved, therefore, resolves itself down to two inquiries: First, did the fact that Griffin signed the cashier's checks and drafts himself constitute notice to the defendant bank that bank funds were being used to pay Griffin's personal obligation? Second, did the manner in which Griffin and the defendant bank handled the $11,000 payment to the Minneapolis bank constitute notice to the defendant bank that bank funds were being used to pay this personal obligation of Griffin?

We are convinced that the fact that Griffin signed the cashier's checks and drafts, which were used by the defendant bank to pay Griffin's personal indebtedness, did not constitute notice to the bank that Ware & Griffin Bank funds were, in fact, being used to pay this obligation of its cashier. The evidence discloses that Griffin for years had paid his personal obligations in this manner with the consent of the directors of the bank, and this defendant bank had knowledge of this fact. The New York Court of Appeals in the case of Goshen National Bank v. State, 141 N. Y. 379, 36 N. E. 316, 317, very effectively, in our opinion, answers the contention that a bank draft signed by a cashier to pay his personal obligation constitutes notice that the draft had not been paid for. We quote at length from the opinion in that case: "Upon the question whether the form of the draft constituted notice to the state or its officer that the funds of the claimant were being used by the cashier to pay his private debt, we think that no notice of such fact was conveyed to the comptroller by this form of draft. It is the right and duty of the cashier of a bank to sign the drafts drawn in its behalf upon its corresponding bank. This is part of the ordinary duties of such an officer, and affirmative evidence of his power to sign drafts appears in this record; and it also appears that he had the right to draw such draft for himself upon the same terms that he would have had in case of a third party, which means, I assume, upon payment to the bank of the amount of the draft. There was an apparent authority to draw the draft. It appeared to have been drawn in the course of the employment of the cashier, and it was an act which was within the scope of his general powers. We do not think that, in the case of a bank draft so drawn, the party receiving it would be charged with the duty of inquiry, or with notice of the fact that the cashier had not

paid for the draft, and that he was therefore using the funds of the bank to pay his private debt. He would only be so using them in case he did not pay for the draft and its form might be the same even if he had paid for it in full. We think there is nothing unusual or suspicious in this form of making the draft payable directly to the creditor of the cashier, nor any notice that in so doing the bank's funds have been improperly used. Bank or cashier's drafts are used so enormously at the present time in the payment or settlement of debts, and in other commercial transactions, that they have almost acquired the characteristics of money. So long as they are drawn on behalf of a solvent bank, and upon a solvent drawee, and signed by one of its officers usually signing such instruments, they are regarded by the commercial community, very much the same as so much cash; and the fact that the draft was drawn by a cashier directly in favor of his own creditor, and sent to that creditor by him, would not naturally give rise even to the suspicion that there was anything irregular, fraudulent, or wrong in the conduct of the cashier. The presumption would be that he had performed his duty, and paid for the draft, and that it, therefore, was his property."

With regard to the $11,000 payment to the Minneapolis bank, the evidence discloses that it had been the practice over a long period of years for Mr. Griffin to pay his personal obligations in the very manner in which this obligation was paid, and that this practice was, at least, tacitly approved by the board of directors of the Ware & Griffin Bank. The evidence discloses that Griffin on many occasions had paid his personal obligations to the defendant bank by his written direction to that bank to charge the account of Ware & Griffin Bank, all without objection by the directors of the Ware & Griffin Bank. Mr. Griffin had for years dealt with the officers of the defendant bank. During all of these years no occasion had ever arisen to question the integrity and honesty of Mr. Griffin, and, as found by the trial court, "the general public in the territory of Clark, and the persons doing business with the Ware & Griffin Bank, had unlimited confidence in the honesty, integrity and fair dealing of the said George C. Griffin." The evidence further disclosed that it was a general custom of the banks in the vicinity of Watertown and Clark for correspondent banks to accept

payment of notes by simply charging the account of the country bank upon the direction of the cashier of that bank, and this was true especially in the dealings between the defendant bank and the Ware & Griffin Bank. We think it clear under these circumstances that the manner in which this $11,000 payment was handled imparted no notice to the defendant bank that bank funds were, in fact, being used to pay this personal obligation of Griffin. Griffin had an apparent authority to pay this obligation in the very manner in which he did pay it, and the defendant bank transacted this business in the usual and regular course of business as it had been established between these banks over the course of a long period of years.

The evidence further discloses that at the end of each month there was transmitted by the defendant bank to the Ware & Griffin Bank a reconciliation sheet, which was a complete itemized statement of the account of the Ware & Griffin Bank with the defendant bank for the preceding month; such statement showing each item of deposit, each item charged to the Ware & Griffin Bank, the daily balance and the balance on the day the statement was rendered. Included in these reconcilement sheets was, of course, the payment of $11,000, and the payment of the cashier's checks and drafts. In each instance this reconcilement sheet was approved by an officer of the Ware & Griffin Bank, either by Mr. Griffin, the cashier, or Mr. Evans, the vice president. The board of directors and stockholders of the bank held all of the semiannual stockholders' meetings following the time the bank was reorganized, and also held monthly and special directors' meetings. At each semiannual meeting of the board of directors, the board certified that it had checked the account of the Ware & Griffin Bank with its correspondent banks, including the defendant bank, and that it approved the balances as shown due from the correspondent banks. Under these circumstances it seems to us that the monthly reconcilement sheets were binding upon the Ware & Griffin Bank. An almost identical situation to that here presented was presented to the late Judge Elliott in the case of Keyes v. First National Bank (D. C.) 20 F. (2d) 678, 686. Judge Elliott in that case said: "The accounts rendered the Eureka bank by the defendant bank were binding upon the board of directors

of the Eureka bank. The directors were in duty bound to examine these accounts and the reconcilements of the Eureka bank, and the receiver who stands in his shoes cannot take advantage of the negligence of the directors. These reconcilements are notice to the directors, who cannot disregard such notice and say that their agents failed to communicate the facts to them."

As pointed out above, in this case we have, in addition to the reconcilements, the affirmative action of the board of directors certifying that the accounts with the correspondent banks, including the defendant bank, were in all things correct. Clearly, these monthly reconcilements were the bases for all future dealings between the two banks, and the defendant bank had the right to rely thereon. In reliance upon the right of Griffin to transact this business in the manner in which it was transacted, the defendant bank surrendered the securities which it had as collateral to Griffin's note, which securities the trial court found had a substantial value. The defendant bank made no effort to collect these Griffin notes while Griffin was still alive, other than to accept the payments which Griffin made. Relying upon the right of Griffin to pay these notes in the manner in which he was paying them, there was, of course, no necessity for the defendant bank to seek any other means of collection. By the time of Griffin's death, his estate had become insolvent. The estoppel, which the trial court found, seems to be complete.

The judgment and order appealed from are affirmed.

All the Judges concur.