Argued January 30; affirmed as to Harney County National Bank
and reversed as to Federal Deposit Insurance Corporation
June 18, 1945; argued on rehearing April 15; former
opinion set aside and case reversed July 1, 1947

# FINE ET AL. *v.* HARNEY COUNTY NATIONAL BANK ET AL.

(170 P. (2d) 365, 182 P. (2d) 379)

In Banc.

*R. E. Kriesien,* of Burns (Casey & Kriesien, of Burns, on brief), for respondents.

*Robert F. Maguire* and *James G. Smith,* both of Portland (with C. B. McConnell, of Burns; Maguire, Shields & Morrison, of Portland; Francis C. Brown, General Counsel, Federal Deposit Insurance Corporation; and James M. Kane, Counsel, Federal Deposit Insurance Corporation, on brief), for appellants.

## LUSK, J.

The defendants assign as error the rulings of the court below denying their motions for directed verdicts and for judgments notwithstanding the verdicts. We will direct our attention to these assignments first as they apply to the Bank.

There is evidence of the following facts: In February, 1941, Edward N. Brown was the vice president and assistant cashier of the Harney County National Bank. The plaintiffs J. B. Fine and Ethel Fine are husband and wife, and for a number of years had maintained a joint commercial account with the Bank in which they carried substantial balances. In 1941 J. B. Fine and Brown were engaged in a joint enterprise— a personal, not a bank, transaction—involving the purchase, pasturing and sale of cattle. On February 11 they met at the Bank for the purpose of determining the balance of accounts between them and of effecting a settlement. After some discussion they agreed that the business should be settled by the payment by Brown to Fine of the sum of $7,650.00. Accordingly, Brown drew his personal check in that amount on his account at the bank payable to Fine, and delivered it to the latter, who immediately endorsed it and handed it back to Brown. Brown thereupon made out original and duplicate deposit tickets showing the deposit of the

endorsed check in the bank, gave the duplicate to Fine, and pushed the original under one of the cashier's windows.

This occurred after banking hours about four-thirty in the afternoon, but no point is sought to be made of that circumstance.

Brown was an embezzler of the Bank's funds, and the check he gave was worthless. There is no evidence, however, that Fine knew of his misconduct or of any fact which should excite his suspicion about Brown's check. On August 6, 1942, after the arrival of a national bank examiner at the Bank to examine into its affairs, Brown committed suicide. The Corporation thereafter, as will more fully appear below, purchased certain assets of the Bank and undertook the liquidation of its affairs.

Sometime in March, 1941, Fine called at the Bank for a statement of his account and received what purported to be such a statement from Brown. This document, which is in evidence, is dated February 17, 1941. The first entry in the balance column shows a balance in the account of $28,573.35 as of January 13. A deposit entry is shown as of February 11 of $7,650.00, and the balance as of February 17 is $37,655.52. The uncontradicted evidence is that the deposit in controversy was never credited to the plaintiff's account on the books of the Bank; that Brown at no time in 1941 had sufficient funds on deposit in the Bank to cover the check; that it was never charged against his account; and that the false statement was prepared by Brown to deceive Fine.

On the ledger sheet of the Fine account kept by the Bank there appears a deposit entry as of February 28, 1941, in the amount of $7,000.00. There is in evidence

a deposit slip in the name of J. B. Fine and purporting to show a deposit of $7,000.00 on February 28, 1941, apparently through the medium of a draft in that amount drawn on the First National Bank of Baker. There is no evidence, unless the writing on the deposit slip be considered such, that any such draft was ever issued or paid. It appears in that connection that on February 27 the balance standing to the Fine account on the books of the bank was $3,666.38, and that on February 28 a check for $10,000.00 drawn on the account by Fine, was presented to the bank for payment and was paid. It is a reasonable inference—perhaps the only reasonable one—that Brown made the false deposit entry of $7,000.00 on the Bank's ledger in order to prevent the creation of a large overdraft in the Fine account which would lead to the discovery of his manipulation of the books and his embezzlements.

A like fictitious deposit entry on May 3, 1941, in the amount of $749.98 appears on the ledger sheet. Immediately prior to this entry the balance in the account had fallen to $9.25, and on May 5 a check for $700.00, drawn on the account, was paid.

There is also in evidence another purported statement of the Fine account received by Fine from Brown and covering the period from February 21, 1941, to April 14, 1941. On the former date the balance shown by this statement is $30,015.54, and on the latter, $19,305.62. As has been seen, the statement delivered to Fine in March disclosed a balance on February 17 of $37,655.52; the two statements, considered together, thus indicating a reduction in the account between February 17 and February 21 of nearly $7,650.00. As to this Fine testified that he did not withdraw that amount nor any appreciable part of it during that period, and

that he did not detect the shortage when looking over his statements. His testimony reveals implicit confidence in the integrity of the Bank and of Brown in particular, and that he paid scant attention to his bank statements and accompanying vouchers. He did not discover the irregularities in the account until after Brown's death.

It is shown by the testimony of John A. Rummel, the national bank examiner who examined the affairs of the institution, that the manipulation of the Fine account had commenced in 1938, and that it was necessary to go back to a time in that year in order to establish a starting point where the ledger sheets of the Bank and the statements issued to Fine were in balance. Rummel went over the account with Fine, and, as a result, "his statement on the bank's ledger was credited with something like $23,000.00 or $24,000.00 and settled satisfactorily between Mr. Fine and myself, and I believe to the Federal Deposit Insurance Corporation, with the exception of this $7,650.00." The witness testified that the corrections in the Fine account were all verified by duplicate deposit tickets which Fine had in his possession with the exception of a deposit ticket for the $7,650.00 item. Upon this point Fine testified that Brown was accustomed to making out his income tax returns for him. For this purpose he would furnish Brown with his bank statements, vouchers and deposit slips; these were found in the Bank by Rummel and returned to him, except the deposit slip for $7,650.00. Nor was Brown's check to Fine for that amount ever discovered.

We deem it unnecessary to determine whether the Bank is concluded by the fictitious deposit entries of $7,000.00 and $749.98 and subsequent withdrawals

referred to in the foregoing statement. Under *Williams v. Dorrier,* 135 Pa. 445, 10 Atl. 1024, which involves similar facts, it would seem that the Bank would be held estopped to deny want of authority in Brown to place those credits to the depositor's account. We prefer, however, to place our decision upon another ground.

■ The general rule applicable to a banking transaction such as that with which we are here concerned is thus stated in 2 Morse on Banks and Banking (6th ed.) 1216, § 569:

> "When a check is presented for deposit drawn on the depositary bank, the bank may refuse to pay it, or take it conditionally by express agreement, or by usage, if such a one exists, as in California; but otherwise, if it pays the money, or gives credit to the depositor, the transaction is closed between the bank and the depositor, unless the paper proves not to be genuine, or there is fraud on the part of the depositor. The giving of credit is practically and legally the same as paying the money to the depositor, and receiving the cash again on deposit. The intent of the parties must govern, and presenting a check on the bank, with a pass book in which the receiving teller notes the amount of the check, is sufficient indication of intent to deposit, and to receive as cash. So a credit on the deposit ticket is as significant an act of receiving the check as cash as is a credit on the pass book or the books of the bank."

To the same effect see 5 Mitchie, Banks and Banking (perm. ed.) 49, § 26; 7 Am. Jur., Banks, 327, § 457; *Oddie v. National City Bank,* 45 N. Y. 735, 6 Am. Rep. 160; *Cohen v. First National Bank,* 22 Ariz. 394, 198 P. 122, 15 A. L. R. 701, with annotation at pp. 709 et seq.

> "The fact that the transaction had not been entered on the books of the bank when the receiver

took charge does not affect the situation. The depositor is not required to see that the deposit is entered on the bank's books or that the check is charged to the drawer.'' 6 Zollmann, Banks and Banking (perm. ed.) 197, § 3818.

■ There are cases where, under certain circumstances, such as evidence tending to show that a check was laid aside for examination until the closing of banking hours before it should be credited, or evidence of usage that checks were so held (see *National Bank v. Burkhardt,* 100 U. S. 686, 25 L. ed. 766), the question whether a check was received for deposit may become one of fact. But we take it that, in the absence of such circumstances or an express agreement that the check is taken conditionally, the question is one of law to be passed on by the court.

Defendants concede the general rule as above stated, but contend that it cannot be applied here because the check, which was the subject matter of the deposit, was Brown's personal check, drawn on his own bank, and given to Fine in payment of his personal obligation. It is not questioned, and it cannot be, that Brown, as assistant cashier and vice president of the Bank, was authorized to receive deposits, but it is asserted that when an officer of a bank delivers his personal check for the purpose of paying his personal debt the person taking the check does so at his own risk and without recourse against the bank, and that one who accepts the personal check of an officer of a bank in payment of a personal obligation and seeks to hold the bank thereon has the burden of proving that the officer had the necessary money on deposit to pay such check. In support of these propositions counsel cite nine cases, but upon an examination of them it will be seen that

only two, *Schwenker v. Parry,* 204 Wis. 590, 236 N. W. 652, and *Columbia Bank v. Morgan,* 198 Wis. 476, 224 N. W. 707, are authority for the rule which defendants would have us adopt.

In the other cases the person dealing with the bank official was informed by the transaction itself that he was using bank funds to pay his personal obligations. In *Hier v. Miller,* 68 Kan. 258, 75 P. 77, 63 L. R. A. 952; *C. M. Condon & Company State Bank v. Richardson,* 117 Kan. 695, 232 P. 1070; and *Greer v. Farmers National Bank of Sulphur,* 174 Okla. 46, 51 P. (2d) 792, the bank officer's debt was attempted to be paid by the issuance of deposit tickets to the creditor. In *First National Bank v. Rust,* 257 Fed. 29 (CCA 5), Cert. denied, 250 U. S. 667, 40 S. Ct. 13, 63 L. ed. 1197, a certificate of deposit was given. In *Bliss v. Live Stock National Bank of Omaha,* 122 Neb. 668, 241 N. W. 106, a draft drawn on another bank was used to pay part of the debt and the balance was charged to the account of the officers' own bank with the bank to whom they owed the money. In *Holland Banking Company v. Republic National Bank,* 328 Mo. 577, 41 S. W. (2d) 815, a draft was drawn on another bank (though in this case the payment was held to be good under a statute). And in *State ex rel. Davis v. Farmers State Bank of Hadar,* 111 Neb. 585, 197 N. W. 386, three notes belonging to the bank were used to pay the individual notes of its cashier.

In none of the foregoing cases was a personal check of the officer of a bank in any way involved except in *Greer v. Farmers National Bank of Sulphur,* supra, and the decision there, against the depositors who were claiming credit for the amount entered on a deposit ticket, was not based on the fact that such a check

had been given, but on the following rule which the court quoted from 3 R. C. L. 531:

"If the cashier of a bank, without actual authority so to do, undertakes to pay his individual debts by entering the amount thereof as a credit upon the pass book of his creditor, who keeps an account with the bank, the bank may recover of his creditor the amount of money it may pay out upon checks drawn upon the faith of the unauthorized pass book entries."

The court moreover expressly recognized that if, as some of the evidence showed, the personal check of the officer of the bank had been issued in payment of the debt, the case for the claimants would have been stronger.

The basis of these decisions and of numerous others with similar facts which might be cited is that the person accepting the bank obligation or memorandum of credit is placed on notice that the officer is using bank funds for his private ends. Thus it is said in 4 Zollmann, Banks and Banking, 286, § 2264, in speaking of bank drafts given by an officer of the bank to pay his personal obligation:

"One who accepts such a draft is placed on notice that the cashier is discharging his personal obligation with the funds of the bank and will not be treated as an innocent holder, but may be required to account for the proceeds. Such a draft imparts notice of its infirmities on its very face. The recipient must at his peril determine whether express power exists for such a purpose. This doctrine finds its basis upon that fundamental maxim that 'a man cannot serve two masters.'"

The author continues:

"The same legal consequences follow where a certificate of deposit instead of a draft is issued, or

a note of the bank is indorsed to the creditor of the officer himself, or where the officer gives his debtor a deposit slip, or enters the amount of the debt in the creditor's passbook, or merely promises to deposit the amount for him, and allows him to check against such fictitious credit. The act of the officer places the customer on inquiry, and entitles the bank to recover from him the money thus paid out."

But the text then proceeds:

"A personal check by the officer, of course, is on a different plane. An officer clearly may have a checking account in his own bank, and the fact that he issues checks against it does not impart notice that any fraud is involved, even though his account is overdrawn or nonexistent."

Again it is said, op. cit., 277, § 2262:

"Since it is a general practice of officers and employees of a bank to patronize it with their deposits and checking accounts, a payee, in accepting checks drawn by such officer or agents, is not charged with any notice that they are to be paid out of the funds of the bank or that there is any lack of authority in the drawer to issue them."

The precise question here presented was decided adversely to defendants' contention in *Pope v. Ramsey County State Bank,* 137 Minn. 46, 162 N. W. 1051. Lamb, the president of the First State Bank of McIntosh, S. D., gave his personal checks drawn on his own bank in payment of his individual notes to the defendant bank. The checks were paid in the usual manner by an adjustment of accounts with the First National Bank of McIntosh, Lamb acting for his bank in the transaction. He did not have sufficient funds on deposit to cover the checks, which were paid with money of the bank. The defendant bank, however, was without knowledge of this fact. It was assumed for the purpose of the decision

that the defendant bank, through its collecting agents, was concluded by the knowledge or notice of its agents that the president of the First State Bank attended to the clearing transactions through which the checks were paid.

In an action brought by the receiver of the First State Bank to recover the proceeds of the checks from the defendant bank a judgment for the plaintiff, based upon a directed verdict, was reversed. The court said:

"Plaintiff invokes the salutary doctrine that one who receives an obligation of a corporation from the officer or agent who issued it in payment of the latter's personal debt is charged with notice of want of authority in the officer or agent to execute the obligation. The presumption is against the right or authority of an officer or agent of a corporation to execute its obligation for his own use. (Citing authorities.) All of these cases, and others to which our attention has been directed, relate to obligations of corporations made out by the officer or agent who used them for his personal purposes to the knowledge of those who received them."

The court then pointed out that the personal checks of the president of the First State Bank did not purport to be the obligations of that bank, whereas a cashier's check, a certified check, or a draft are the absolute obligations of the bank issuing them. It was assumed—and justifiably so—that it is a general practice of the officers of a bank to keep checking accounts in their own bank.

"Therefore defendant, in accepting these checks of Lamb, could not be charged with any notice that they were to be paid out of the bank funds, or that there was any lack of authority in the drawer to issue them. * * *

"It will not be questioned, we believe, that one who receives from the president of the Merchants'

National Bank in St. Paul a check, drawn on that bank, in payment of the personal note of such president, and obtains the money upon presentation to the paying teller of the bank, cannot thereafter be called upon to refund that money by mere proof that the president's account was overdrawn. Such a transaction would seem to be as legitimate and safe to the person so receiving the money on the check as if he had been paid in currency instead of by check. Here defendant in collecting these checks pursued the ordinary legitimate business course. So did the First National Bank of McIntosh in presenting them for payment and receiving the amount. There was nothing to advise that bank that Lamb's account was overdrawn, or to suggest such a state of affairs. The ones in charge of the State Bank of McIntosh were attending to their duties in the customary way. In the cases hereinbefore cited notice of the corporation's ownership of the funds came from the instrument itself. In the absence of such notice there must be proof that the one who receives the money knows or has reason to believe the same to be a misappropriation. There was no such proof here. The fact that to the knowledge of the First National Bank of McIntosh the State Bank had only Mr. Lamb, his wife, and a bookkeeper in charge of its business, and that Mr. Lamb served both as paying and receiving teller, and adjusted clearings, does not signify.''

Counsel for the defendants endeavor to distinguish this case by the statement that one of the principal facts relied on by the court in reaching its decision was that Lamb, some time after he had paid his own checks out of bank funds, made a deposit sufficient in amount to cover all funds which had been withdrawn. In our opinion this is a misconception of the scope and effect of the decision. It is true that at the end of the opinion the court added a paragraph in which it was said that there was no justice or equity in plaintiff's favor in view of the subsequent deposit. But the case was de-

cided upon the grounds which we have indicated, independently of this circumstance. That this is so is emphasized by a specially concurring opinion of one of the judges, who took issue with the conclusions of the court which we have quoted, but thought that the fact that the moneys had afterwards been deposited by the bank president justified the result.

Aside from the two Wisconsin cases above cited there are only two other jurisdictions, so far as we are advised, in which the question has been passed upon. In *Pemiscot County Bank v. Tower Grove Bank of St. Louis,* 204 Mo. App. 441, 461, 223 S. W. 115, the court adopted a view in harmony with that in *Pope v. Ramsey County State Bank,* supra. *First National Bank of High Bridge, N. J. v. Hudson,* 166 App. Div. 51, 151 N. Y. S. 595, 598, seems to be to the same effect. See 4 Zollmann, op. cit., 288, note 59.

The Wisconsin decisions refuse to recognize the distinction between an obligation of the bank, given in payment of a bank officer's individual debt, and a personal check on his own bank issued for a like purpose by a bank officer and thereafter cashed by him, and hold "on grounds of sound public policy" that a person takes such a check at his peril and without recourse against the bank where there are no funds on deposit to meet it. *Schwenker v. Parry,* supra, 204 Wis. 598, 599. We are unable to accept the reasoning of the Wisconsin court nor do we find any justification in public policy for the rule which it has adopted. To us the difference between the position of one receiving from the agent of a corporation in payment of the agent's debt an obligation of the corporation, and that of one receiving the agent's personal check drawn on the bank of which he is an officer or employee seems to be obvious and to require nothing further than its statement. In the one

428

case the recipient of the bank's obligation, being advised by that very fact that the bank officer is using the moneys of his principal for his private purposes and not for corporate purposes—that, as the court said in *Hier v. Miller*, supra, he is trying to serve two masters —has a duty to ascertain whether so unusual an authority has been conferred upon him. In the other case, which is an ordinary business transaction, no such duty arises. As stated in 4 Mitchie, op. cit., 285 § 117, in the course of a discussion of this subject:

> "A transaction out of the usual course and showing the antagonistic relations of the bank officer is sufficient to put a third person on notice."

In our opinion, the transaction here in question is not of that kind.

■ The defendant Bank, therefore, was not entitled to a directed verdict; while, on the other hand, under the facts in evidence and the rule of law applicable thereto which we deem correct, the plaintiffs were entitled to recover as a matter of law. The proof of those facts was given by the plaintiff J. B. Fine. His testimony is not impeached and his credibility not called in question. Indeed, counsel for the defendants in his argument to the jury said:

> "I have no desire, certainly I have no intention to say, I have no feeling that Mr. Fine is not a fine, honest man. I think he has told the truth just as near as human recollection will permit, of the facts. I haven't any reason to doubt that when he said this happened at that particular time, that it did happen."

Notwithstanding this concession by counsel, the court submitted to the jury for their determination the question whether the transaction, as testified to by Fine,

had occurred, and their verdict for the plaintiffs conclusively establishes the fact. And, as no claim or suggestion is made that Fine did not accept Brown's check in good faith and without actual notice or knowledge of any fact which would lead him to suspect that the check was not good, the ultimate question here is, in any event, one of law, and must be, as stated, resolved in favor of the plaintiffs.

We come now to a consideration of the ruling denying the motion of the defendant Corporation for a directed verdict.

Upon the question whether the Corporation assumed payment of the deposit liability to the plaintiffs there is evidence of the following facts:

Under date of September 12, 1942, the Corporation executed an instrument, denominated "Power of Attorney", which recites that the Corporation previously "designated Frank Strain Liquidator of the assets purchased by the Corporation under its purchase agreement dated the twenty-ninth day of August, 1942, with The Harney County National Bank of Burns", and, among other things, authorized the said Frank Strain "to sign, seal and deliver as the act and deed of said Corporation, any instrument in writing, and to do every other thing necessary and proper for the collection and recovery by this Corporation of any and all sums, moneys and properties of every kind and nature whatsoever for and on behalf of this Corporation".

While so acting as liquidator Strain prepared a document in which he analyzed the plaintiffs' claim and recommended that it be paid. This document he forwarded to the Chicago office of the Corporation about May 25, 1943.

Under date of July 28, 1943, Strain executed as "Agent for Federal Deposit Insurance Corporation" a

duly verified proof of amended or supplemental claim in the matter of the estate of Edward N. Brown, deceased, which claim was presented to the executors of that estate, was by them rejected, and was filed in the Circuit Court of the State of Oregon for Harney County on September 27, 1943. The claim recites:

"This claim is for losses suffered by the Harney County National Bank of Burns, Oregon, by reason of the confessed dishonesty of the decedent while he was employed as an officer of the bank and in the manner set forth in the attached schedules referred to and described as follows:

"Schedule 1—Additional Deposit Liabilities set up by Federal Deposit Insurance Corporation claim agents subsequent to December 31, 1942, in the amount of $17,143.61."

Schedule 1 lists a deposit liability to J. B. Fine in the amount of $7,610.53.

The evidence as to Strain's acts was objected to on the ground that he had no authority to bind the Corporation by the recommendation in question or to allow claims on its behalf. Strain did not testify as to the extent of his authority, but J. F. Angel, senior assistant supervising liquidator of the Corporation, who was called as a witness by the defendants, testified on direct examination that ordinarily the liquidator has nothing to do with deposit claims or with deposit liabilities assumed by the Corporation. He was asked:

"In this particular case was Mr. Strain authorized by you or by the Corporation to fix or determine or allow any claims on deposit liability?"

and answered:

"In this particular instance my recollection is that Mr. Strain was requested to submit certain information from the records."

He testified that the board of directors is authorized to, and does, determine the action of the Corporation with regard to any specific deposit liability or alleged deposit liability, and in practice that power may be delegated to the chief of the division of liquidation.

"Q Now I will ask you whether or not a liquidator has any authority from the corporation to determine and attest or fix or allow any claim of deposit liability?"
"A No."

Referring to the document containing Strain's recommendation with respect to the plaintiffs' claim the witness testified:

"Q I will ask you whether or not the statement contained particularly under the head of 'Comments?' there—to whom those statements are made, to whom a report like that is made?

"A This report was submitted to the Division of Liquidation of the Federal Deposit Insurance Corporation.

"Q By whom then is that considered and finally passed on as to whether or not the recommendation will be followed, or whether it is well founded?

"A It is finally passed on by the Chief of the division of liquidation.

"Q And until such report is finally passed on and the recommendation followed is any action ever taken by the Corporation?

"A No.

"Q Is that anything more than the recommendation by a liquidator to his superior as to what should be done in the way in which the corporation's business is and has been done?

"A It is no more than his recommendation, I would say.

"Q Does a liquidator have any power or authority or is he granted any power or authority by the corporation to allow any kind of claim?

"A Not unless the claim has been approved by his superiors."

On cross-examination the witness testified as follows:

"Q I will ask you to read the verification on the proof of claim filed in the estate of Edward N. Brown filed on the 15th day of April, 1943. You may read it. Just read it to yourself, don't read it to the jury. You have testified as to the powers and duties of a liquidator. Did the individual who executed that affidavit have power to execute that?

"A He had power provided he was directed to do it, that would be my conclusion.

"Q You don't know whether he was directed to file this proof of claim?

"A I don't know. I might assume that he was directed to do it.

"Q That would not be in the usual course of his duties?

"A That would be unusual.

"Q The filing of a proof of claim would be unusual?

"A That might be unusual yes. He could do it as an agent of the corporation if he were directed to do it.

"Q But without direction from the corporation he would have no authority; is that correct?

"A I wouldn't say whether that is correct or not, but what his power of attorney covers.

"Q You were quite familiar on your direct examination with all of the duties and rights of a liquidator. You are the Senior Assistant Supervising Liquidator. You testified directly as to his powers and duties. Do you or do you not know whether he had authority in the line of his duties as a liquidator from the Federal Deposit Insurance Corporation to sign an instrument of this character?

"A If he didn't have authority under what was first given him when he came out here, he was subsequently given that authority, I might assume.

"Q You would assume that he was given authority to file proof of claim in the Edward N. Brown estate?

"A Yes.

"Q Then it would be in the usual course of his business and within his powers, is that correct?

"A Yes in his powers.

"Q And in the line of his duties as liquidator of this particular office, is that correct?

"A Yes."

■ While it is true, as contended by counsel for the Corporation, that an opinion of an agent, based upon past occurrences such as that expressed by Strain in his recommendation relative to the plaintiffs' claim, does not bind his principal (*Briggs v. John Yeon Co.*, 168 Or. 239, 254, 122 P. (2d) 444, yet that rule can have no application where the opinion is communicated to the principal who thereafter acts upon it.

■ We think that the evidence objected to was properly admitted and that, under the record as made, it established a *prima facie* case of assumption by the Corporation of the deposit liability in question. While it may not be said that the power of attorney in itself authorized the liquidator to determine the merits of a disputed claim against the Corporation, we think that from the evidence of the witness Angel it could be determined as a fact that Strain was authorized to file the claim against the Brown estate after having submitted his recommendation to the Corporation. Angel testified that he would assume that the action taken was "within his powers", and, under his testimony, viewed in its entirety, we see no reason why the jury might not have made the like assumption.

If this be so, then the inference would be warranted that the Corporation had assumed the Bank's deposit liability to the plaintiffs. The proof of claim against the Brown estate was "for losses suffered by the Harney County National Bank of Burns, Oregon, by reason of the confessed dishonesty of the decedent", and it would not be unreasonable to infer that the assertion of that claim was based upon such assumption.

■ We conclude, therefore, that there was some competent evidence introduced to support the allegations of the complaint against the Corporation, and its motion for a directed verdict was properly denied.

The next assignment of error to be considered is based upon an exception taken by the defendant to an instruction given by the court. The facts leading up to the giving of this instruction need first to be recited.

On September 29, 1943, the plaintiffs moved the court "for an order requiring the Federal Deposit Insurance Corporation to furnish plaintiffs a copy of the agreement entered into between the Federal Deposit Insurance Corporation and the Harney County National Bank relating to the assumption of the liabilities of the Harney County National Bank by the Federal Deposit Insurance Corporation", and on the same day the court made an order in writing directing "that the defendant Federal Deposit Insurance Corporation furnish unto plaintiffs a copy of all agreements pertaining to the assumption of the liabilities of the defendant Harney County National Bank by the defendant Federal Deposit Insurance Corporation on or before the 5th day of October, 1943." This order was served on Mr. C. B. McConnell, attorney for the defendant Corporation, on September 30, 1943.

On the day of the trial, October 13, 1943, the Corporation, through its attorney, Mr. Robert F. Maguire,

who appears to have come into the case shortly prior to that date, produced in court and presented for the inspection of counsel for plaintiffs a certain contract between the Bank and the Corporation, and made certain representations to the court tending to excuse the Corporation's failure to comply with the court's order within the time therein specified. Counsel for the plaintiffs objected to the tender of the document because it came too late, and the court, after listening to discussion by counsel, ruled that the defendant Corporation had been guilty of laches and neglect in its failure to produce the document as ordered.

Upon the trial the court sustained plaintiffs' objection to the admission in evidence of such document when offered by the defendant Corporation, and further sustained plaintiffs' objection to the admission in evidence of another contract between the Bank and The United States National Bank of Portland by which the latter assumed the liabilities of the former. In submitting the case to the jury the court gave the following instruction:

> "In this connection however I instruct you that by reason of the failure of the defendant Federal Deposit Insurance Corporation to produce certain documents with relation to liability, that you are to presume the allegation of Paragraph 5 of the Complaint to be true: That is, that the Federal Deposit Insurance Corporation assumed all of the liabilities of the Harney County National Bank, and no proof is to be required for the establishment of that allegation."

This, of course, taken with the other instructions, was a direction to the jury to find against the Corporation if the liability of the Bank should be established.

The statute under which the trial judge purported to act is § 10-401, O. C. L. A., and reads:

"The court or judge thereof, while an action or suit is pending, may order either party to give the other, within a specified time, an inspection and copy, or permission to take a copy of any book, document, or paper in his possession, or under his control, containing evidence or matters relating to the merits of the action or suit, or the defense therein. If obedience to the order be neglected or refused, the court may exclude the book, document, or paper from being given in evidence, or if wanted as evidence by the party applying therefor, may direct the jury to presume it to be such as he alleges it to be; and the court may also punish the party so neglecting or refusing as for a contempt. This section is not to be construed to prevent a party from compelling another to produce books, documents, or papers, when he is examined as a witness."

Nothing in these provisions authorized the court's ruling in the circumstances of this case. Aside from punishment for contempt, the statute provides two penalties for neglect or refusal to obey the order for inspection. One is to exclude the document from being given in evidence, and the other is a direction by the court to the jury to presume the document to be such as the party applying for it alleges it to be, if such document is *"wanted as evidence by the party applying therefor"*. Unless, therefore, it affirmatively appears in the record that plaintiffs wanted the document as evidence the instruction went beyond the power conferred on the court. There is no such showing. A request for an inspection or copy of a document is not tantamount to a request for its use as evidence, and in this case, when the contract was produced prior to the commencement of the trial, counsel for plaintiffs, so far from wanting it as evidence, refused to have anything

to do with it and on the trial objected to its admission when offered by the defendant Corporation. It would be an anomalous situation indeed if a party were per-. mitted to object to the admission in evidence of a document in one breath and in the next demand that the jury be instructed that the document is what he alleges it to be because he wanted it as evidence. The anomaly is heightened when, as will be shown to be the case here, it appears from an inspection of the document that its meaning and intent are the antithesis of the instruction. The provisions in question for penalizing the negligent or recalcitrant party are not cumulative but in the alternative, and their obvious intent is that, where the order is not complied with and the document is not made available to the party applying for it and desiring to use it as evidence, then and then only is the court authorized to give such an instruction as was given in this case.

■■ The court is authorized by the statute to direct the jury to presume the book, document or paper to be such as "the party applying" for it "alleges it to be." In this case the only representation as to the character of the agreement is found in the motion for an order of inspection. The complaint itself contains no reference to any such document. In the motion it is referred to as an agreement "relating to the assumption of the liabilities of the Harney County National Bank by the Federal Deposit Insurance Corporation", and it is stated that it "contains evidence or matter relating to the merits of this action". The motion is subscribed by the attorneys for the plaintiffs. It is not sworn to. It is the *party* applying for the document, not his attorney, who is required to allege the character of the document before the instruction is authorized, and the allegation, we think, must be under oath. "The statute does not

expressly provide that it is to be sworn to, nor even
that it must be in writing, although the word 'allega-
tion' from the analogy of other judicial proceedings
points to that formality": *People v. Wyatt,* 186 N. Y.
383, 389, 79 N. E. 330, 10 L. R. A. (N. S.) 159, 9 Ann.
Cas. 972. In Nebraska there is a statute almost identical
with ours which provides that, if the book, paper or
document is "wanted in evidence by the party applying
for it, (the court) may direct the jury to presume it to
be such as the party by affidavit alleges it to be." In
*Sallander v. Prairie Life Insurance Co.,* 110 Neb. 332,
193 N. W. 737, it was held, as stated in the syllabus by
the court, that under this statute "the proper practice
is for the party desiring to use the book, paper or
document in evidence to offer an affidavit setting forth
the contents of such book, paper or document. It then
becomes the duty of the court to instruct the jury to
presume that the contents of the book, paper or docu-
ment is such as the affidavit alleges it to be." We hold
that under our statute, before an instruction of the
kind in question may be given, the party applying for
the book, paper or document must allege its character
in writing under oath. An unsworn motion, subscribed
by the party's attorneys, does not, of course, fulfill that
requirement, and, even though it could be said that it
did, the recitals in the motion under consideration
would not support the instruction given by the court
that the jury must presume "that the Federal Deposit
Insurance Corporation assumed all of the liabilities
of the Harney County National Bank". There is no
such allegation in the motion or anywhere else in the
record.

The giving of the instruction complained of was
reversible error.

Since the case must be remanded for a new trial as

to the liability of the Corporation, we deem it unnecessary to inquire whether the court abused its discretion in refusing to accept the excuse offered by the Corporation for its failure to comply strictly with the terms of the court's order and in excluding from evidence, for that reason, the contract between the Corporation and the Bank. The question in that form cannot arise again, and, since the agreement is of the highest relevancy, it should be admitted if offered upon another trial. It may be observed in passing, however, that the ultimate end for which courts are constituted is to administer justice through the ascertainment of truth, and that judicial rulings which shut out the truth are not lightly to be pronounced. There is much to be said for the view expressed by the court in a similar case "that the penalty enforced in this case should be resorted to only where there is a clear and deliberate attempt to impede justice or to suppress evidence": *Davidoff v. Kaplan,* 209 App. Div. 592, 204 N. Y. S. 543.

A brief consideration of the contract between the Bank and the Corporation and of another contract executed at the same time by the Bank and The United States National Bank of Portland will make it apparent that the case, as tried and submitted to the jury, ignored the realities so far as the question of the Corporation's liability was concerned. For these documents show that while The United States National Bank assumed the deposit liabilities of the defendant Bank, the Corporation did nothing of the kind—at least it did not do so in the sense that it made itself liable to the plaintiffs or any other depositor.

The contract between the Corporation and the Bank was entered into under date of August 29, 1942, pursuant to authority granted the Corporation by Subsection (n) (4) of § 264, Title 12, U. S. C., which provides

that the Corporation may "make loans secured in whole or in part by assets of an open or closed insured bank, which loans may be in subordination to the rights of depositors and other creditors, or the Corporation may purchase any such assets or may guarantee any other insured bank against loss by reason of its assuming the liabilities and purchasing the assets of an open or closed insured bank." It recites that the Corporation has determined to purchase all of the assets of the Bank not purchased by The United States National Bank of Portland. The property sold includes "any claims against its (the Bank's) directors, officers or employees or their sureties arising out of any act of any such persons in respect to the Bank or its property or arising out of the non-performance or manner of performance of their duties * * *" It is recited that the agreed value of the assets acquired by The United States National Bank, together with $906,856.47 of what is called the Initial Cash Purchase Price is intended to equal but not exceed the aggregate amount of the liabilities of the Bank to its depositors as shown on an exhibit attached to the contract. But, if the liabilities should be less than that amount, the Bank authorizes The United States National Bank to pay over the difference to the Corporation, such payment to constitute a part of the property sold by the Bank to the Corporation. The Initial Cash Purchase Price consists of (a) $906,856.47 in cash plus (b) "the amount of the liability or liabilities, if any, of the Bank to any depositor or depositors for any reason not included and listed in Schedule 'A' hereto, provided that the Corporation alone and in its sole and absolute discretion shall determine, and such determination by it shall be final, the amount of the liability or liabilities, if any, and the identity of the depositor or depositors of

the Bank, if any, not so included and listed in said Schedule 'A'." In addition to the Initial Cash Purchase Price the Corporation agrees to pay a Further Sum, which, however, is not pertinent to the present inquiry. The contract contains the following paragraph:

> "Such contract shall inure solely to the benefit of the Corporation, its legal successors and assigns, and shall be binding upon and inure to the benefit of the Bank, its legal successors and assigns, but shall not be assignable by the bank as a whole or in part without the written consent of the Corporation, and shall not be construed to inure to the benefit of any parties other than the parties hereto."

The contract between The United States National Bank and the defendant Bank contains a recital to the effect that the Corporation has made a commitment to purchase certain assets in order to provide the defendant Bank with sufficient funds to make possible the transfer of certain of its assets to The United States National Bank in consideration of the assumption of its liabilities by the latter to the extent and in the manner thereinafter set forth. In consideration of the transfer of such assets The United States National Bank assumed and agreed to pay liabilities of the defendant Bank aggregating $1,267,449.12. The United States National Bank further agreed to pay, but only upon written certification addressed by the Corporation to the defendant Bank, any deposit liabilities of the defendant Bank not included in a schedule attached to the contract, provided that such liability should not arise until the defendant Bank shall transfer and pay over to The United States National Bank cash or property in an amount equal to such additional liabilities. There is an express provision granting to depositors

and creditors the right to enforce the provisions of the contract against The United States National Bank. It is also provided that in the event the amount actually due to the depositors and creditors named in the schedule of liabilities is less than the amount stated in said schedule The United States National Bank agrees to pay the amount of such excess to the Corporation forthwith upon discovery thereof.

In addition to the contracts counsel for the Corporation also offered in evidence a letter dated August 29, 1942, addressed to the Corporation by the defendant Bank and reading as follows:

> "The Harney County National Bank has assigned to The United States National Bank of Portland the amount due from your corporation for the purchase of certain assets of this bank in accordance with the contract of this date between this bank and your corporation.
>
> "Accordingly, you are requested to disburse the sum of $906,856.47 representing such purchase price to The United States National Bank of Portland, Portland, Oregon."

The arrangement portrayed by these contracts and the quoted letter was one under which The United States National Bank assumed and agreed to pay all the deposit liabilities of the defendant Bank in consideration of the transfer to the former of certain assets of the latter together with the money which the Corporation agreed to pay for the remaining assets, all of which was intended to equal the total amount of the then ascertained deposit liabilities. If any deposit liabilities should subsequently be asserted and determined by the Corporation to be such the amount thereof would be paid by the Corporation to the Bank as part of the purchase price of the assets sold to the Corpora-

tion. The Corporation expressly stipulated, as it had a right to do, against liability to any third party such as the plaintiffs assert. And, among the assets which it purchased from the defendant Bank were claims against the officers and employees thereof based on their misconduct, a provision which would adequately explain the act of the Corporation in filing a claim against the Brown estate for the amount of the deposit liability to the plaintiffs.

From the foregoing review of the contents of the three documents, the prejudice to the defendant Corporation resulting from the court's refusal to admit them in evidence is obvious. Without the light which they shed upon the case, the evidence that the Corporation filed a claim against the Brown estate for the amount of the deposit liability to the plaintiffs was sufficient, as we have held, to warrant an inference that the Corporation had assumed that liability. But, were the contracts and letter in evidence, an entirely different case would be presented. We, of course, have no means of knowing what character of evidence may be produced on another trial and, therefore, express no opinion as to what the ultimate outcome of the case as to the defendant Corporation may be. Neither do we intimate an opinion as to whether, in the event that the plaintiffs cannot recover in the present case, they may or may not have a remedy in some other form of proceeding by reason of the agreements in question.

In view of our disposition of the controlling questions in the case, we find it unnecessary to discuss any of the remaining assignments of error, except one, which relates to a matter of pleading.

Paragraph V of the complaint alleged in effect that the defendant Corporation took over all the assets of

the defendant Bank and assumed all of its liabilities, including its liability to the plaintiffs. By its answer to this paragraph the defendant "denies that it assumed all of the liabilities of the Harney County National Bank of Burns, Oregon, and denies that it assumed liability to pay the plaintiff's the sum of $7,650.00, or any other sum whatsoever." On the day of the trial, but before the commencement thereof, counsel for the defendant Corporation tendered to the court, and asked leave to file, an amended answer in which it would have added to the denials above quoted the following:

"Further denies that it took over all or any of the assets of said bank, and denies that it assumed all or any of its liabilities and denies that it assumed any liability of said bank to plaintiff, and particularly denies that it assumed any liability of said bank to plaintiffs by reason of said alleged deposit of $7650.00, or any part thereof."

The court denied the application, and in its charge to the jury instructed that the denials we have quoted from the answer on which the case was tried were negatives pregnant, which, in effect, admitted that the Corporation took over "any and every portion of the assets of the bank less than the total liabilities with the exception of the liability to the plaintiffs."

■ We will not decide whether denial of the application to amend constituted an abuse of discretion. The rule forbidding a negative pregnant is recognized in this state (*Minter v. Minter*, 80 Or. 369, 157 P. 157), though we think that it "is greatly affected by the liberal rules of construction and amendment of pleadings that prevail generally under the codes", 41 Am. Jur., Pleading, 429, § 196. It is asserted in the plaintiffs' brief in one breath that denial of the application

to amend did not prejudice the defendant Corporation, but in the next breath it is argued that the supposed admission of the answer that the Corporation assumed the Bank's liabilities, warranted the court in excluding from the evidence the contracts and letter above discussed which would have demonstrated that those admissions were contrary to the fact. The most that can be said for the court's ruling is that plaintiffs' counsel might have been misled by the form of the pleading and that the application to amend came too late. That will not be the case on another trial, and if the application should be renewed, it should be granted.

The judgment is affirmed as to the defendant Bank, and as to the defendant Corporation it is reversed and the cause remanded for further proceedings in conformity to this opinion.

Argued on rehearing April 15; former opinion set aside
and case reversed July 1, 1947

On Rehearing
(182 P. (2d) 379)

*R. E. Kriesien,* of Burns (Casey & Kriesien, of
Burns, on brief), for respondents.

*Robert F. Maguire* and *James G. Smith,* both of
Portland (with C. B. McConnell, of Burns; Maguire,
Shields & Morrison, of Portland; Francis C. Brown,
General Counsel, Federal Deposit Insurance Corpora-
tion; and James M. Kane, Counsel, Federal Deposit
Insurance Corporation, on brief), for appellants.

Before Rossman, Chief Justice, and Lusk, Belt,
Bailey, Hay and Winslow, Justices.

LUSK, J.

Recurrence to fundamental legal principles, which,
although not overlooked, were not properly applied,
leads to the conviction that our former decision of
the question involved on this rehearing was erroneous
and must be set aside.

Plaintiffs J. B. Fine and Ethel Fine, his wife, had
a joint account in the Harney County National Bank.
Fine and Brown, the vice president and assistant
cashier of the Bank, engaged in a private business
transaction which terminated in an agreement that
Brown owed Fine $7,650.00. The Bank was not a party
to this transaction nor in any way concerned in it. To
pay this indebtedness Brown gave Fine his check for
the amount thereof drawn on his personal account at
the Bank. Fine endorsed the check and immediately
thereafter Brown accepted it for deposit in the Fines'

joint account. This occurred at the Bank after banking hours when no other officer or employee of the Bank was present. Brown's check was worthless. The amount thereof was not charged against his account, nor entered as a credit on the Fines' ledger sheet kept by the Bank; the check itself was never found among the Bank's papers, nor was the deposit slip, a duplicate of which was received by Fine; there was no record of the transaction in any of the books of the Bank and no evidence that any officer or employee of the Bank, other than Brown, had any knowledge of the issuance of the check or its deposit until after the Bank failed some nineteen months later. If the plaintiffs should prevail in this action it will be solely because of Brown's fraudulent act, of which the Bank had no notice, and the Bank will be saddled with Brown's debt to Fine. The question is: Did Brown have authority to accept the check for deposit? It is conceded that if he represented the Bank in the transaction the Bank is bound. 2 Morse on Banks and Banking (6th ed.) 1216, § 569; 6 Zollmann, Banks and Banking (Perm. ed.) 197, § 3818; 5 Michie, Banks and Banking (Perm. ed.) 49, § 26; 7 Am. Jur., Banks, 327, § 457; *Oddie v. National City Bank,* 45 N. Y. 735, 6 Am. Rep. 160; *Cohen v. First National Bank,* 22 Ariz. 394, 198 P. 122, 15 A. L. R. 701, with annotation at pp. 709 et seq. It is also conceded that as assistant cashier he had general authority to accept deposits. But it is contended that he was without authority to accept for the Bank the deposit of his own check given by him to pay a personal debt, thereby making the Bank liable for the amount of such check, and that Fine was put on notice of his want of authority by the transaction itself.

It is an established principle of the law of

agency that an agent cannot bind his principal in a matter in which his own interest conflicts with the duty he owes his principal. *Haines v. First National Bank,* 89 Or. 42, 49, 172 P. 505; *State v. Miller,* 47 Or. 562, 566, 85 P. 81, 6 L. R. A. (N. S.) 365. As stated in 1 Mechem on Agency (2d ed.) 535, § 754: "It is often said that his endeavor to do so operates as an immediate revocation of his authority. That an agent undertakes to do so is therefore enough to put the other party on his guard." So it is held, when the question is as to the interpretation of an authority expressly conferred, "that a general power or authority given to the agent to do an act in behalf of the principal does not extend to a case where it appears that the agent himself is the person interested on the other side. If such a power is intended to be given, it must be expressed in language so plain that no other interpretation can rationally be given it, for it is against the general law of reason that an agent should be intrusted with power to act for his principal and for himself at the same time." *Bank of New York v. American Dock & Trust Co.,* 143 N. Y. 559, 38 N. E. 713 (per Peckham, J.). See, also, Restatement, Agency, § 389, 3 C. J. S., Agency, 9, § 139, 184, § 253; 2 Am. Jur., Agency, 204, § 253; *Michoud v. Girod,* 4 How. 503, 555, 11 L. ed. 1076.

Upon this principle it was held in *Claflin v. Farmers' & Citizens' Bank,* 25 N. Y. 293, that a general authority to the president of a bank to certify checks drawn upon it does not extend to checks drawn by himself. "The act of the agent", it was said in that case, "is deemed to be unauthorized, and the contract is void." That case was decided in 1862, and the rule which it establishes has never, so far as we are aware, been questioned by any court. See *Rankin v. Chase*

*National Bank,* 188 U.S. 557, 47 L. ed. 594, 23 S. Ct. 372; *State v. Miller,* supra, 47 Or. 567.

It was upon this principle likewise that the Wisconsin court in *Schwenker v. Parry,* 204 Wis. 590, 236 N. W. 652, and *Columbia Bank v. Morgan,* 198 Wis. 476, 224 N. W. 707, decided that an officer of a bank is not authorized to accept for deposit his own check on the bank given in payment of his personal debt, and that the payee of the check is charged with notice of his want of authority. We considered these cases in our former opinion, but, for the reasons there stated, felt justified in declining to follow them. Since the filing of the petition for rehearing our attention has been called to *Haynes v. Lincoln Trust Co.,* 141 Me. 100, 39 Atl. (2d) 657, decided October 26, 1944, a case squarely on the point which had not been cited in the briefs of counsel. The Maine court, in an able and well reasoned opinion, took the same view of the question now before us as the Wisconsin court.

The only other jurisdiction, so far as we are advised, where the identical question has been determined is Minnesota, in the case of *Pope v. Ramsey County State Bank,* 137 Minn. 46, 162 N. W. 1051. We followed that decision, approving the distinction which the Minnesota court drew between a case like the present one and cases which, as that court said "relate to obligations of corporations made out by the officer or agent who used them for his personal purposes to the knowledge of those who received them." Instances of this sort are where a bank officer, to pay his own debt, gives to his creditor a certificate of deposit of his own bank, drawn by himself, or a draft drawn by the officer on another bank, or issues to the creditor a deposit slip showing a credit in the amount of the officer's

indebtedness. *Hier v. Miller,* 68 Kan. 258, 75 P. 77, 63 L. R. A. 952; *C. M. Condon & Company State Bank v. Richardson,* 117 Kan. 695, 232 P. 1070; *Greer v. Farmers' National Bank of Sulphur,* 174 Okl. 46, 51 P. (2d) 792; *First National Bank of Sweetwater, Tex. v. Rust,* 257 F. 29 (C. C. A. 5th), certiorari denied, 250 U. S. 667, 63 L. Ed. 1197, 40 S. Ct. 13; *Bliss v. Live Stock National Bank of Omaha,* 122 Neb. 668, 241 N. W. 106; *Holland Banking Company v. Republic National Bank,* 328 Mo. 577, 41 S. W. (2d) 815; *State ex rel. Davis v. Farmers State Bank of Hadar,* 111 Neb. 585, 197 N. W. 386; and *State v. Thedford Bank,* 114 Neb. 534, 208 N. W. 627. To this class of cases we might have added those in which it is held that a bank officer has no authority to certify his own check.

 Upon reexamination of the question, we are forced to the conclusion that the distinction is more apparent than real, since in a case of this kind, no less than in any of the others, the bank officer assumes conflicting positions and attempts to represent the corporation in a matter in which his own interest is opposed to the duty he owes to his principal. Where a depositor presents to a bank officer for deposit a check drawn on the latter's own bank, it is his duty to determine whether the check is good, and, if it is not to refuse to accept it. That duty in this case conflicted with the interest which the assistant cashier, Brown, had to discharge his private debt by accepting for deposit his own check, which he knew to be worthless. Fine did not know that the check was worthless, but he did know that Brown, as the court said in *Haynes v. Lincoln Trust Co.,* supra, "acted in a dual capacity as principal and also as agent of the Bank." The law charged him with that knowledge. The fact that the

bank officer is personally interested in a transaction of this character is sufficient to put the creditor upon notice of the extent of the former's authority. *Hier v. Miller,* supra.

In our former opinion we distinguished such cases as *Hier v. Miller,* supra, (in which the bank officer merely issued a deposit slip to his creditor) by saying that the person accepting the bank obligation or memorandum of credit is placed on notice that the officer is using bank funds for his private ends. Similarly, the court in *Pope v. Ramsey County State Bank,* supra, said that in such cases "notice of the corporation's ownership of the funds came from the instrument itself. In the absence of such notice there must be proof that the one who receives the money knows or has reason to believe the same to be a misappropriation."

■ But it is not sufficient to show that the party dealing with the bank officer is put on notice that the latter is interested in the transaction adversely to the principal whose interests it is his high duty to protect? The question concerns the officer's authority, and, if the party dealing with him knows or is charged with knowledge that his authority does not extend to the business in hand unless it has been especially conferred, then the duty of inquiry arises; otherwise he acts at his peril. This is brought out with clarity and force in the case of *Lamson v. Beard,* 94 F. 30, 45 L. R. A. 822 (C. C. A. 7th). The case holds that commission merchants in Chicago, who accepted and cashed drafts drawn by the cashier of a small bank in Iowa in payment of his personal obligations, were liable to the bank for the money so received, the cashier not having been authorized by the directors of the bank to use drafts

for his individual purposes. In the course of the opinion the court said:

"It is, doubtless, a not unusual practice for debtors to obtain and send to their creditors bank drafts, drawn payable to the creditors, and, of course, in every such case the creditor knows that the money of the bank is being used to pay to him the debt of another,—in the case supposed, the debt of John Doe. But in such cases the creditor may accept the draft without inquiry, *not, as counsel have said, because of a presumption that the debtor had paid for the draft, but because the draft had been drawn by the authorized officer of the bank in the usual course of business, acting without apparent or known personal interest in the transaction.* The receiver of such a draft, though named as payee, and on the face of the paper apparently a party to the original execution thereof, is not so in fact, but, as against the drawer, is in effect an indorsee, affected only by vices or infirmities of which he had notice before he accepted it. He might know that the draft had not been paid for, and yet take it on the assumption of regular and proper execution upon some other consideration than payment. *The inquiry, therefore, which these plaintiffs in error should have made, was whether Cassatt had authority to draw drafts of the bank upon funds of the bank in possession of its correspondents for use in his individual transactions.* Such an inquiry involved no difficulty beyond communicating to the directors of the bank, other than Cassatt, the fact that such a draft or drafts had been tendered in discharge of liabilities incurred in dealings upon the Board of Trade in Chicago, and asking whether the execution of the paper had been authorized. There can be little doubt what would have been the result of such an inquiry, accompanied with a frank and full statement of the facts as they were known to the payees of any of the drafts in suit at the time of execution. It would not have needed a discovery

of Cassatt's fraudulent bookkeeping to enable the directors to say whether the execution of such paper had been theretofore authorized, or then had their approval. As contended, it was clearly no duty of the plaintiffs in error to undertake an examination of the books, which, once they commenced inquiry into the management of the bank, they would have learned had been wholly in the keeping of Cassatt, and of clerks who could not be expected to testify against him. Inquiry of Cassatt, too, it is to be presumed, would have been useless, and therefore, if made, would not have met the requirement of the law. The one thing necessary to be known was whether Cassatt had authority to make the proposed use of the bank's paper. The authority could have come only from the directors, by direct resolution or by acquiescence or implied assent, and the plain, unmistakable course was to push the inquiry, *wherever begun, to the source of authority.*" (Italics added)

See, to the same effect, *St. Charles Savings Bank v. Edwards,* 243 Mo. 553, 147 S. W. 978.

In cases such as *Lamson v. Beard,* supra, and *Hier v. Miller,* supra, the fact that the bank officer is using bank monies for his individual purposes may be more apparent than in a case such as this. It could perhaps be plausibly argued that the personal check of the bank officer is some assurance to the one receiving it that the money is on deposit with which to pay it. But it is not the check by itself which is the basis of the bank's asserted liability; it is the act of the officer in receiving it for deposit and issuing a deposit slip showing that the bank has become indebted to the recipient in the amount of the check. It is the binding effect of the agent's assumption of authority which is and must be the foundation of the plaintiff's claim. Without that there would be no semblance of a right to recover

against the bank. The charge in the complaint in this case is that "plaintiffs deposited to their credit with the defendant Harney County National Bank the sum of $7,650.00, making a total of deposits as aforesaid of $37,889.22, all of which said sums defendant Harney County National Bank promised and agreed to pay and disburse according to and upon the demand and order of the plaintiffs, but defendant Harney County National Bank failed and neglected to credit said sum of $7,650.00 to plaintiffs' account." The plaintiffs' right to recover depends upon proof of the foregoing allegations, and, of course, if the evidence fails to show that the Bank, through its duly authorized agent, acting within the scope of his authority, accepted the check for deposit and promised to repay the amount thereof to the plaintiffs, their case fails.

As stated, it is the law that a bank officer has no authority to certify his own check. It is difficult to perceive even a plausible distinction between such an act and what was done here. In each instance the officer draws his check on his personal account with the bank and attempts to bind the bank to the payment of the check—in the former by stamping it "Good", in the latter by issuing a deposit slip for the amount of the check. In each instance he acts both as principal and agent, and, if the checks are in fact not good, the result of the establishment of a rule of law in accordance with the plaintiffs' contention would be to sanction the fraudulent use of the bank's funds by its officer.

In *Haynes v. Lincoln Trust Co.,* supra, it was argued that the court should apply the rule that, where one of two innocent persons must suffer by the wrongful act of a third, he who gave the power to do the wrong must bear the consequences. But the court

answered that the rule was without application where the plaintiff was dealing with a manager of a bank on his own personal business and the bank had not authorized him to pay his own debts with its funds; that in such case the duty rested on the plaintiff to ascertain if he was using his own funds and not misappropriating those of his employer; and that, while the burden might appear onerous and not in accordance with popular concept, yet "it gives effect to the only safe rule." As to the consequences to be borne either by the creditor or by the bank, the court said:

"The debt has not been paid. The creditor is in the same situation as before the fraudulent act of Noddin (the bank manager) was committed. He has the same right of action against him as he had then. The debtor may be bankrupt and the claim against him of no value, but there has been no change in legal status as between the principals in the transaction, and it would be an ominous and dangerous rule to hold that a bank can give its treasurer license to steal its own funds or those entrusted to it by other depositors to pay his own debts."

To put the matter somewhat differently: The rule invoked is not applicable because in a legal sense Fine was not an innocent person, and the court will not permit him to profit at the Bank's expense by giving effect to Brown's attempt to steal the Bank's money.

One of the cases relied on by the plaintiffs is *Goshen National Bank v. State,* 141 N. Y. 379, 36 N. E. 316. It appeared in that case that the cashier of the bank was also county treasurer, and in the latter capacity had collected taxes for the state which he neglected to pay over. Upon receiving demand for payment he mailed to the state comptroller a draft drawn by him

as cashier upon another bank, which the latter paid and charged to the Goshen Bank. The cashier, who was an embezzler, kept the fact of the drawing of the draft concealed from the other officers of his bank. The Goshen Bank sued the state to recover the amount of the draft. The evidence showed that the cashier had been authorized to draw drafts on the corresponding bank for himself upon the same terms that he had a right to draw a draft for a stranger, that is, upon payment to the bank for the amount of the draft. In view of this grant of authority the court held that the bank was not entitled to recover from the state the amount of the draft in question. A few months later the case of *Bank of New York v. American Dock & Trust Co.*, supra, was decided. It appeared in that case that the president of a storage and warehouse company, who had express authority to sign warehouse receipts, obtained a personal loan from the bank giving his note therefor, and deposited with the bank as collateral security a warehouse receipt signed by himself as president of the company and showing that certain cotton had been received by the company as storage "for account of M. W. Stone" (the president). The loan not having been paid and a demand by the bank upon the company for the cotton or its value having been refused, the bank sued the company for damages for issuing a spurious warehouse receipt. The decision was for the defendant. It was said that if the president had issued a receipt acknowledging the receipt of cotton from a third person, although none had been deposited, the defendant would have been liable because the president had general authority to issue receipts for cotton deposited by third persons. The principle was said to be "that where an agent has been clothed by his principal with power to do an act, in case of the existence

of some fact peculiarly within the knowledge of the agent, and where the doing of the act is in itself a representation of the existence of that fact, the principal is estopped from denying its existence, as against third parties dealing with the agent in good faith, and in reliance upon the representation.'' But the authority granted could not be construed to extend to a case where the agent himself is the person interested on the other side, and consequently the warehouse company was not bound by the act of the president. The Goshen Bank case was distinguished on the ground that it appeared ''that the cashier had power to draw drafts for his own use, or payable to his own order, upon the same terms that he had to draw a draft for a stranger, viz. upon payment to the bank of the amount of the draft'', and ''the very act of the issuing the draft was a representation of the existence of the fact that the draft was paid for.'' See, also, *Hanover National Bank v. American Dock & Trust Co.,* 148 N. Y. 612, 43 N. E. 72, 51 Am. St. Rep. 721.

This distinguishing feature of the Goshen Bank case is pointed out in *Lamson v. Beard,* supra, 94 F. 42, where, as we have seen, it is held that persons receiving drafts drawn by a bank cashier in payment of his individual debts are charged with knowledge of the cashier's want of authority to draw drafts for such purpose, and are liable to the bank for the monies so received.

In the instant case there is no evidence that Brown, the assistant cashier, had authority to receive deposits of his own checks, and such authority cannot be inferred. *Bank of New York v. American Dock & Trust Co.,* supra. The burden of proving that Brown had such special authority was on the plaintiffs. *St.*

*Charles Savings Bank v. Edwards,* supra; *Campbell v. Manufacturers National Bank,* 67 N. J. L. 301, 304, 51 Atl. 497, 91 Am. St. Rep. 438.

The case of *Pope v. Ramsey County State Bank,* supra, is, we believe, the only decision supporting the plaintiffs' position. While there are expressions in *Pemiscot County Bank v. Tower Grove Bank,* 204 Mo. App. 441, 223 S. W. 115, and *First National Bank of High Bridge, N. J. v. Hudson,* 166 App. Div. 51, 151 N. Y. S. 595, which seem to aid the plaintiffs, the decisions themselves when considered in the light of the facts to which they relate do not. In the former case it appeared that the directors of the bank knew that the cashier had been in the habit of issuing bank drafts in payment of his personal checks given for his individual debts; in the latter case, with the knowledge of other officers of the bank, the cashier gave his personal checks in payment of the purchase price of securities which he was buying for the bank, but which he stole, and the books showed payment of such checks. Both were clear cases of apparent authority. So, likewise, were the following cases cited by plaintiffs: *Ruden v. Citizens National Bank & Trust Co.,* 64 S. D. 340, 266 N. W. 682; *Citizens' Trust Co. v. Croll,* 289 F. 421 (C. C. A. 7th); *Wing v. Commercial & Savings Bank,* 103 Mich. 565, 61 N. W. 1009; *People's Bank of Belleville v. Manufacturers' National Bank of Chicago,* 101 U. S. 181, 25 L. ed. 907. In *Bank of Taylorsville v. Blyth,* 269 Ill. App. 16, also cited by the plaintiffs, it appeared that the cashier had been granted express authority to issue cashier's checks for his personal debts provided he paid for the checks. The point of distinction is the same as that in the Goshen Bank case. And in *Gale v. Chase National Bank,* 104

F. 214 (C. C. A.), the court held that apparent authority in the cashier to pay creditors with drafts drawn on his own bank did not exist, notwithstanding evidence that on five occasions prior to the transaction in dispute he had drawn drafts for such purposes.

The plaintiffs contend, however, that the evidence shows that Brown had apparent authority to use the funds of the Bank in payment of his personal indebtedness. They say in their brief in opposition to the petition for rehearing:

> "The uncontradicted evidence of this case is that Brown had authority to issue deposit slips, that he withheld deposits of Plaintiffs-Respondents aggregating the sum of Sixty Six Thousand Five Hundred Seven and eighty-four/100 Dollars ($66,507.84); made improper charges against Plaintiffs-Respondents account of Fifty Thousand Nine Hundred Eleven and seventy-seven/100 Dollars ($50,911.77) and made deposits in the accounts of Plaintiffs-Respondents with Bank funds in the amount of Ninety Two Thousand Two Hundred Thirty Seven and seventy-nine/100 Dollars ($92,237.79) over a period in excess of four years. The Directors of the Defendant Bank permitted its cashier to embezzle approximately Four Hundred Thousand Dollars ($400,000.00) of its funds constituting one-third of the capital assets of the Bank, over a period of years."

A leading case on apparent or ostensible authority is *Martin v. Webb,* 110 U. S. 7, 28 L. ed. 49, 3 S. Ct. 428. The question there was whether the cashier of a bank was authorized to release the security of a deed of trust. It was shown that for about seven years the directors had left to the cashier the exclusive management of the bank, and that during that time he had satisfied more than 150 deeds of trust executed to

secure debts held by the corporation, and in no instance had he received orders to do so from the board of directors. To all who came into the bank or had transactions with it his control seemed to be as absolute as if he were the owner of all the stock. Under these circumstances it was held that the bank would not be permitted to question the cashier's authority in the particular transaction. In the opinion by Mr. Justice HARLAN the facts showing the manner in which the bank's affairs had been conducted by the cashier were set forth at length "so that", as the court said, "the general expressions in this opinion may be interpreted by the facts of this case."

After stating that the cashier has no power by virtue of his office to bind the corporation except in the discharge of his ordinary duties, and that this would not include the exercise of the power in question unless the authority was delegated by the directors, the court said:

"While these propositions are recognized in the adjudged cases as sound, it is clear that a banking corporation may be represented by its cashier, at least where its charter does not otherwise provide, in transactions outside of his ordinary duties, without his authority to do so being in writing or appearing upon the record of the proceedings of the directors. His authority may be by parol and collected from circumstances. It may be inferred from the general manner in which, for a period sufficiently long to establish a settled course of business, he has been allowed, without interference, to conduct the affairs of the bank. It may be implied from the conduct or acquiescence of the corporation, as represented by the board of directors. When, during a series of years or in numerous business transactions, he has been permitted, without objection and in his official capacity, to pursue a particular

course of conduct, it may be presumed, as between the Bank and those who in good faith deal with it upon the basis of his authority to represent the corporation, that he has acted in conformity with instructions received from those who have the right to control its operations. Directors cannot, in justice to those who deal with the Bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and supervision of its officers. They have something more to do than, from time to time, to elect the officers of the Bank and to make declarations of dividends. That which they ought by proper diligence, to have known as to the general course of business in the Bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business.''

See, also, 1 Morse on Banks and Banking (6th ed.) 476, 481, 482, § 171; 4 Zollmann, Banks and Banking 457, § 2414. The cases of *Wing v. Commercial & Savings Bank,* supra, and *Anderson v. Kissam,* 35 F. 699, reversed *sub nom. Kissam v. Anderson,* 145 U. S. 435, 36 L. ed. 765, 12 S. Ct. 960, relied on by the plaintiffs, contain nothing that is out of harmony with the principles stated in *Martin v. Webb,* supra.

■ The question here, as we view it, is not whether Brown was authorized to use the Bank's funds to pay his individual debts. In view of the addition to the Federal Reserve Act of June 16, 1933, 12 U. S. C. A. § 375a, which provides that ''no executive officer of any member bank shall borrow from or otherwise become indebted to any member bank of which he is an executive officer, and no member bank shall make any loan or extend credit in any other manner to any

of its own executive officers'', it was beyond the powers of the directors to confer such authority.

Plaintiffs argue that the statute cannot affect their contractual rights with the Bank, and cite the case of *Goldstein v. Union National Bank,* (Tex. Civ. App.) 216 S. W. 409. That case had been previously before the Supreme Court of Texas, 109 Tex. 555, 213 S. W. 584, and the law of the case there established. It was an action on a promissory note executed to a bank by the defendants, one of whom, Walker, was an officer of the bank and, with the other defendant, Goldstein, was a stockholder in L. Wenar Millinery Co., a corporation, which was a depositor and customer of the bank. The defendant, Goldstein, alleged in his answer that, the millinery company being indebted to the bank in the sum of $20,000.00, which was the full loaning capacity of the bank to any one person, firm or corporation, the millinery company and the bank, represented by Walker, agreed that Goldstein and Walker should execute notes for the accommodation of the millinery company to be discounted by the bank, the proceeds thereof to be used by the millinery company in transacting its business in some other way than paying its indebtedness to the bank, and that deposits made by the millinery company with the bank should be applied at once to the extinguishment *pro tanto* of any note made by the defendant, Goldstein, pursuant to said agreement; but that the bank, contrary to such agreement, had applied deposits made by it in liquidation of the millinery company's indebtedness to it. It was claimed that Goldstein was entitled to. have these deposits credited on the note sued upon and which was given in pursuance of the agreement stated. The Texas Supreme Court apparently held that the answer stated a good defense to the action.

If that be the effect of the decision, it is in conflict with *Deitrick v. Greaney,* 309 U. S. 190, 84 L. ed. 694, 60 S. Ct. 480, and *Federal Deposit Insurance Corporation v. Vest,* 122 F. (2d) 765. The former case holds that one who knowingly gave a note to the bank as a substitute among its assets for shares of its stock illegally purchased and retained (in violation of 12 U. S. C. A. § 83) could not plead as a defense in an action on the note that the obligation was in effect fictitious. The court, speaking through Mr. Chief Justice Stone, said:

> "Since it is by virtue of the statute that respondent's agreement is unlawful and that the benefit of it as a defense to the note is denied; and as the purpose of the statute is to protect creditors of the bank from the hazard of violations of the Act like the present, it is immaterial that the bank's officers were participants in the illegal transaction * * *"

In *Federal Deposit Insurance Corporation v. Vest,* supra, an accommodation note was given to a national bank at the instance of its president to enable the president to obtain funds from the bank without appearing to be a borrower. The court held, on the authority of the Deitrick case that, since it is unlawful for an executive officer of a bank to borrow from the bank (12 U. S. C. A. § 375a), the fact that the note was without consideration could not be pleaded against the bank. Answering the contention that the defendant did not know that the statute prohibited the bank officer from borrowing the bank's money, the court said:

> "It is beside the point to say that he acted in good faith and without intent to defraud the bank or its creditors. The vital question is, whether he wittingly or unwittingly was a party to an act

made unlawful by the National Banking law and of this there can be no doubt.''

We regard these federal decisions as authoritative.

■ According to Professor Mechem, powers of an agent commonly referred to as ''apparent'' are either (1) those which are incidental to the main authority conferred because that is the regular and ordinary way of doing business, or (2) those which are ''sought to be deduced from special circumstances of recognition, acquiescence or holding out'', as to which ''the principle of estoppel or something akin to it at least, must be invoked''. 1 Mechem on Agency 509-513, §§ 720-726. In the latter class of cases the author says:

''* * * it is obvious that the doctrine can apply only in those cases in which (the) element of reliance was present. It can therefore apply only to cases in which credit has been extended, action has been induced, delay has been obtained, or some other change of position has occurred, in reliance upon the appearance of authority * * *'' Ibid. 512, § 724.

■ Agreeably to the foregoing principles, it would seem to be manifest that in neither aspect of the question could it be said that the assistant cashier, Brown, had apparent authority to use the funds of the Bank for his private purposes. That would be a violation of the Federal Reserve Act, and, therefore, not incidental to the main powers he possessed. And, of course, the plaintiffs could not be heard to say that they relied upon such appearance of authority, since they were charged with knowledge that it was an authority the exercise of which would be unlawful and beyond the powers of the directors to confer. *Federal Deposit Insurance Corporation v. Vest,* supra. See in this connection 1 Morse on Banks and Banking (6th ed.) 482,

§ 171; *Merchants' Bank v. State Bank,* 10 Wall. 604, 19 L. ed. 1008; *Pensacola Bank & Trust Co. v. National Bank of St. Petersburg,* 59 Fla. 347, 357, 52 So. 294; *Anderson v. Kissam,* 35 F. 699, at p. 702.

██ But this may be put out of view, for the real question relates to the apparent authority of Brown to bind the Bank by accepting for deposit his own check drawn on his personal account at the Bank and given in payment of his individual debt. On this question there is no evidence whatever, and the case is, therefore, unlike *Martin v. Webb* or any of the other cases to which we have referred. It is not shown that Brown had ever before, either with Fine or anyone else, assumed to exercise such authority. Indeed, there is a singular paucity of evidence as to the powers which he did exercise. If this was "a one-man bank" it is not disclosed by the record. It may, perhaps, be inferred from the fact that Brown was able without detection to embezzle $400,000.00 of the Bank's money that he was active in the conduct of its business. He was also evidently very active in the preparation of false customer's statements for delivery to Fine and, probably, to other depositors, and in making false entries in the Bank's ledger sheets which contained the records of deposits and withdrawals of the various depositors. By these and, no doubt, other methods not disclosed, he successfully concealed his embezzlements from the directors of the corporation and the bank examiners over a period of several years. But the evidence has no tendency to show authority in Brown, conferred on him by "acquiescence of the corporation" in a "particular course of conduct", to accept on behalf of the Bank his own checks for deposit and credit the depositor with the amount thereof. And there is no evidence in the case

that the plaintiff Fine did in fact rely and act upon this supposed course of conduct of Brown, and therefore no estoppel in pais was created upon the defendant Bank. *Gale v. Chase National Bank,* supra, 104 F. at p. 219.

We conclude that the claim of apparent authority has no support in the record.

■ We come to the final contention of the plaintiffs based upon two deposit entries appearing upon the plaintiffs' account in the Bank's ledger, one dated February 28, 1941, in the amount of $7,000.00, and the other dated May 3, 1941, in the amount of $749.98. The transaction here in dispute occurred on February 11, 1941, and the plaintiffs say that these subsequent credits constitute a restitution of the amount of the $7,650.00 check which was not entered as a credit on the books of the Bank.

The entries now in question were made by Brown, as we stated in our former opinion, to prevent overdrafts appearing in the plaintiffs' account, which would have led to the discovery of Brown's embezzlements. We characterized them as fictitious. Counsel for the plaintiffs take issue. They say that the deposits are supported by drafts on the Bank of Baker; that the defendant Bank is estopped to deny their validity; and that the burden is on the defendants to prove that the Bank did not actually receive the funds. Upon the last proposition they quote from *Anderson v. Kissam,* supra, but we are unable to see anything in that case relevant to the question.

We are still of the opinion that these were fictitious entries made by Brown for the purpose stated. If the defendants had the burden of proving their real character we think they have done so conclusively. Besides

the entries themselves the only evidence relied on as showing that they were deposits of actual funds, consists of deposit slips in Brown's handwriting purporting to show two drafts drawn on the Baker bank in the respective amounts of the entries. There is no record to show that such drafts were actually issued or paid, or that the defendant Bank had money on deposit at the Baker bank. The $7,000.00 deposit of February 28, 1941, was entered when the Fine account showed a balance of $3,666.38, and on the same day a check for $10,000.00 was paid. The $748.98 deposit was entered on May 3, 1941, when the balance in the account was $9.25, and the next day a check for $700.00 was paid. Mr. Fine testified that he did not make either of these deposits, and he gave similar testimony with respect to many others of the same character that appear upon his ledger sheet. After the Bank's failure he made a settlement with Mr. Rummell, the national bank examiner who came to take charge of the Bank's affairs, which covered every irregular item in the account except the check involved in this case. All improper charges against the account were eliminated and the plaintiffs were given credit for all deposits actually made but not credited on the books, except the check for $7,650.00; and, as we understand the record, amounts which had been improperly credited to the Fine account were charged back to the plaintiffs. A balance in excess of $22,000.00 in the plaintiffs' favor was arrived at and the money paid to them. Both Fine and Rummell testified to the facts of this settlement, and, while neither stated specifically that the improper credits were charged back, we assume they must have been because Rummell testified without contradiction that everything was settled satisfactorily except the $7,650.00 item. If, however, we are mistaken in this

interpretation of the evidence, then the plaintiffs have no cause to complain because, through withdrawals, they received the benefit of the two deposits in question. If we have correctly construed the evidence, the settlement made conclusively establishes that these were fictitious deposits acknowledged to be such by Fine himself.

If this were a case in which the Bank was suing to recover the amounts of these two deposits after they had been withdrawn by the plaintiffs, then *Williams v. Dorrier,* 135 Pa. 445, 19 Atl. 1024, upon which their counsel rely, might be applicable. In that case it was held at *nisi prius* (the point not being involved on the appeal) that, where a cashier of a bank credited a depositor with a sum of money on the books of the bank as payment of the cashier's private debt, and the depositor withdrew the money, in an action brought by the bank's receiver to recover the money so withdrawn, the bank must be taken to have acquiesced in and ratified the action of its cashier and is estopped from setting up his want of authority to give the credit. This, however, is not an action by the Bank to recover the amount of these two deposits, and, in view of the evidence of the settlement between Fine and the bank examiner, *Williams v. Dorrier* can in no aspect of the case be held applicable.

■ There is a further reason why the plaintiffs' position in this regard is untenable. This case was not brought on the theory now advanced. The plaintiffs sued to recover the amount of a deposit which, they alleged in their complaint, the defendant Bank "failed and neglected to credit * * * to plaintiffs' account". They ought not to be permitted to recover on the

theory that the amount of deposit was in fact credited to their account.

After the parties had rested the defendants moved for a directed verdict and the court denied the motion. It is our opinion, after reconsideration of the case, that for the reasons herein stated this was error. The assistant cashier, Brown, was not authorized to act for the Bank in the transaction and his acts, therefore, could not and did not create a deposit liability against the Bank for the amount of the check in question. The defendant Federal Deposit Insurance Corporation was sued as guarantor of the alleged deposit liability, and the case against it falls with that against the Bank.

Our former opinion affirming the judgment against the Bank and remanding the cause for a new trial as to the Insurance Corporation is set aside.

A separate judgment was entered against each defendant. These are reversed and the cause will be remanded with directions that they be vacated and judgments for the defendants entered.